# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### KANSAS CITY DIVISION

**F.C., L.H., M.M., KIMBERLY STEAKLE, SUSAN OAKES, ASHLEY BUEHLER, MUKHLISA ISKANDAROVA, CHELSEA ROTH, SARAH FRAUNDORFER** and her minor child **I.F., TERESA MORE,** and **JENNETTE HANSEN,** individually and on behalf of all others similarly situated,

Plaintiffs,

v.

**MID AMERICA PHYSICIAN SERVICES, LLC,**

Defendant.

Case No.: 4:25-CV-00685-RK

**JURY TRIAL DEMANDED**

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs F.C., L.H., M.M.,[1] Kimberly Steakle, Susan Oakes, Ashley Buehler, Mukhlisa Iskandarova, Chelsea Roth, Sarah Fraundorfer and her minor child I.F., Teresa More, and Jennette Hansen (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" or "Class Members" (as further defined below), bring this class action lawsuit against Defendant Mid America Physician Services, LLC ("MAPS" or "Defendant") to obtain damages, restitution, and injunctive relief. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and facts that are a matter of public record.

---

[1] Plaintiffs F.C., L.H., and M.M. bring this class action lawsuit anonymously out of desire to protect their protected health information under the Health Insurance Portability and Accountability Act of 1996.

# I.    SUMMARY OF ACTION

1.    This class action arises out of Defendant's failure to properly safeguard and protect Plaintiffs' and Class Members' highly sensitive protected health information ("PHI") and personally identifiable information ("PII")[2] resulting in a large and preventable data breach that impacted what is estimated to be thousands of individuals (the "Data Breach" or "Breach").[3] As a result, Plaintiffs' and the Class's Private Information (defined below) was compromised and is now in the hands of cybercriminals who can immediately put their Private Information to a variety of sordid uses.

2.    MAPS is a medical services provider providing medical care to patients in Missouri and Kansas.[4] Specifically, MAPS provides obstetrics and gynecology services to women.[5]

3.    In connection with the medical services MAPS provides, MAPS acquires highly sensitive PII and PHI from Plaintiffs and the Class, including their names, addresses, email addresses, phone numbers, dates of birth, Social Security numbers, financial information (*e.g.*, account numbers and/or credit or debit card numbers), medical information, and/or health insurance information (collectively, "Private Information").

4.    On or about November 14, 2024, MAPS discovered a network incident that impacted its IT systems.[6]

5.    After an investigation, which concluded on or around May 8, 2025, MAPS

---

[2] PHI is inclusive of PII.

[3]    *Data Security Breach Reports*, ATTORNEY GENERAL OF TEXAS, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (search "Mid America Physician Services") (at least 636 Texas residents were impacted).

[4]https://www.midamericaphysicians.com/images/Elements/Notice_of_Data_Security_Incident.pdf (last visited Sept. 19, 2025).

[5] https://www.midamericaphysicians.com/ (last visited Sept. 19, 2025).

[6]https://www.midamericaphysicians.com/images/Elements/Notice_of_Data_Security_Incident.pdf (last visited Sept. 19, 2025).

announced (via notice of data breach letters ("Notice Letters") sent to the victims) that names, addresses, dates of birth, medical treatment information, billing information, and health insurance information were exposed during the Breach.[7] However, MAPS reported to the Attorney General of the State of Texas that names, addresses, Social Security numbers, financial information (*e.g.*, account numbers and/or credit or debit card numbers), medical information, and/or health insurance information were also exposed in the Data Breach.[8] Thus, this Data Breach exposed highly sensitive Private Information.

6.      Despite the Breach occurring on or around November 14, 2024, MAPS did not notify victims of the Data Breach's occurrence until in or around July 2025—*approximately eight months later*.[9]

7.      Because the services MAPS provides involve highly private and sensitive matters—including obstetrics and gynecology—the exposure of Plaintiffs' and the Class's Private Information in the Data Breach is particularly egregious and embarrassing for many Class Members. The Data Breach is an extreme invasion privacy to Plaintiffs and the Class.

8.      Upon information and belief, the Data Breach was a direct result of MAPS's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect individuals' Private Information. Indeed, the Data Breach makes it clear that MAPS was not adequately protecting the sensitive Private Information entrusted to it because it was easily accessible to cybercriminals on its network.

---

[7] *Id.*

[8] *Data Security Breach Reports*, ATTORNEY GENERAL OF TEXAS, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Sept. 19, 2025).

[9]https://www.midamericaphysicians.com/images/Elements/Notice_of_Data_Security_Incident.pdf (last visited Sept. 19, 2025).

9. Upon information and belief, MAPS maintained Plaintiffs' and the Class's Private Information in a reckless manner. Specifically, the Private Information was maintained in a condition vulnerable to cyberattacks.

10. Upon information and belief, cybercriminals intentionally targeted MAPS because of its inadequately secured network and because of the highly Private Information it stores therein. As a result, the Private Information of Plaintiffs and Class is in the hands of cybercriminals who will use it for nefarious purposes for the rest of their lives.

11. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to MAPS. MAPS was on notice that failing to take steps necessary to secure Private Information from those risks left the Private Information in a dangerous condition.

12. Plaintiffs bring this class action lawsuit on behalf of themselves, and all others similarly situated to address Defendant's failure to safeguard Plaintiffs' and the Class's Private Information and for failing to provide adequate and timely notice of the Data Breach to Plaintiffs.

13. MAPS disregarded the rights of Plaintiffs and Class Members by, *inter alia*: (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its networks were protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiffs' and Class Members' Private Information; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; and (iv) failing to provide Plaintiffs and Class Members with prompt and full notice of the Data Breach.

14. In addition, MAPS failed to properly monitor the network compromised in the Breach. Had MAPS properly monitored its network, it would have discovered the intrusion sooner

rather than allowing cybercriminals days of unfettered access to the Private Information of Plaintiffs and Class Members.

15. Armed with the Private Information stolen in the Data Breach, data thieves can commit a variety of crimes including: (i) filing false medical claims using Class Members' information; (ii) impersonating Class Members to get medical services; (iii) unlawfully receiving Class Members' Medicare or Medicaid benefits; (iv) purchasing prescription medications in Class Members' names; (v) deploying phishing campaigns to trick Class Members into giving them more sensitive information or to pay for fake services they never received; (vi) blackmailing victims; (vii) selling it on the dark web for profit; (viii) extorting victims for ransom demands; (ix) committing identity theft and fraud.[10]

16. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect its patients' Private Information from a foreseeable and preventable cyberattack.

17. The Data Breach is also a source of embarrassment and humiliation for Plaintiffs and Class Members because their private medical information has been accessed by an unauthorized actor.

18. As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and for years into the future closely monitor their medical care, health insurance, and financial accounts to guard against medical and identity theft.

---

[10] Anna Flairty, *What hackers really do with stolen patient data* (March 9, 2023), https://www.paubox.com/blog/how-hackers-use-stolen-patient-data (last visited Sept. 19, 2025).

5

19. Plaintiffs and Class Members will also incur out of pocket costs for, *e.g.*, purchasing medical monitoring services, credit monitoring services, credit freezes, credit reports, and/or other protective measures to deter and detect medical and identity theft.

20. Plaintiffs and Class Members have a continuing interest in ensuring that Private Information is and remains safe, and they should be entitled to injunctive and other equitable relief.

21. Plaintiffs seek to remedy these harms on behalf of themselves and all other similarly situated individuals whose Private Information was accessed and/or acquired during the Data Breach and seek remedies including, but not limited to, compensatory damages, nominal damages, reimbursement of out-of-pocket costs, attorneys' fees and expenses, and injunctive relief including improvements to MAPS's data security systems, future annual audits, as well as long-term and adequate medical monitoring services funded by MAPS, and declaratory relief.

## II. THE PARTIES

22. Plaintiff **F.C.** is a resident and citizen of Kansas City, Missouri. Plaintiff F.C. is a victim of the Data Breach and received a Notice Letter from Defendant dated July 14, 2025.

23. Plaintiff **L.H.** is a resident and citizen of Kansas City, Missouri. Plaintiff L.H. is a victim of the Data Breach and received a Notice Letter from Defendant dated July 14, 2025.

24. Plaintiff **M.M.** is a resident and citizen of Kansas City, Missouri. Plaintiff M.M. is a victim of the Data Breach and received a Notice Letter from Defendant dated July 14, 2025.

25. Plaintiff **Kimberly Steakle** is a resident and citizen of Mission, Kansas. Plaintiff Steakle is a victim of the Data Breach and received a Notice Letter from Defendant dated July 14, 2025.

26. Plaintiff **Susan Oakes** is a resident and citizen of Shawnee, Kansas. Plaintiff Oakes is a victim of the Data Breach and received a Notice Letter from Defendant dated July 14, 2025.

27. Plaintiff **Ashley Buehler** is a resident and citizen of Johnson County, Kansas. Plaintiff Buehler is a victim of the Data Breach and received a Notice Letter from Defendant dated July 14, 2025.

28. Plaintiff **Mukhlisa Iskandarova** is a resident and citizen of Overland Park, Kansas. Plaintiff Iskandarova is a victim of the Data Breach and received a Notice Letter from Defendant dated July 14, 2025.

29. Plaintiff **Chelsea Roth** is a resident and citizen of Olathe, Kansas. Plaintiff Roth is a victim of the Data Breach and received a Notice Letter from Defendant dated July 14, 2025.

30. Plaintiff **Sarah Fraundorfer** and her minor child, **I.F.** are residents and citizens of Shawnee, Kansas. Plaintiff Fraundorfer and her minor child I.F. are victims of the Data Breach and each received Notice Letters from Defendant dated July 14, 2025.

31. Plaintiff **Teresa More** is a resident and citizen of Gardner, Kansas. Plaintiff More is a victim of the Data Breach and received a Notice Letter from Defendant dated July 14, 2025.

32. Plaintiff **Jennette Hansen** is a resident and citizen of Prairie Village, Arkansas. Plaintiff Hansen is a victim of the Data Breach and received a Notice Letter from Defendant dated July 14, 2025.

33. Defendant **Mid America Physicians Services, LLC** is a Kansas professional limited liability company with its principal office address located at 9301 W 74th Street, Suite 325, Overland Park, Kansas 66204. Defendant's registered agent is Randal L. Schultz who can be served at 7300 West 110th Street, Suite 150, Overland Park, Kansas 66210. Defendant provides services to citizens of Missouri in the Kansas City area.

### III. JURISDICTION AND VENUE

34. This Court has diversity jurisdiction over this action under the Class Action

7

Fairness Act (CAFA), 28 U.S.C. § 1332(d) because this is a class action involving more than 100 Class Members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least some members of the Class are citizens of states that differ from Defendant.

35. This Court has personal jurisdiction over the parties because, as alleged above, at least one Plaintiff is a citizen of the State of Missouri and Defendant provides services to Missouri citizens in the Kansas City, Missouri area.

36. Venue is proper in this District because at least one Plaintiff was first injured in this District, Defendant's actions and/or omissions giving rise to this case affected Plaintiffs residing in this District, and Defendant is subject to this Court's personal jurisdiction with respect to such actions.

## IV.    <u>FACTUAL ALLEGATIONS</u>

**A. *Defendant Collected Plaintiffs' and the Class's Private Information During the Course of the Highly Confidential Services It Provides.***

37. MAPS is based in Kansas and provides obstetrics and gynecology services throughout Kansas and the surrounding areas.[11]

38. MAPS has multiple locations, including: (i) Johnson County OBGYN; (ii) Women's Care; (iii) Women's Clinic of Johnson County; and (iv) Women's Health Associates.[12]

39. The services and procedures MAPS provide are of a highly sensitive and confidential nature.[13]

40. Some of these services include:

     a) Obstetrics;

---

[11] *See* https://www.midamericaphysicians.com/ (last visited Sept. 19, 2025).
[12] *See* https://www.midamericaphysicians.com/about-us (last visited Sept. 19, 2025).
[13] *See* https://www.joco-obgyn.com/services (last visited Sept. 19, 2025).

8

b) Gynecology;

c) Hysterectomies;

d) Endometrial ablation;

e) Lactation;

f) Ovarian cystectomy; and

g) Tubal ligation, sterilization.[14]

41. As evidenced by the above, MAPS provides a wide range of highly sensitive and private medical services to individuals who often have very sensitive and personal health conditions that do not want this information to be publicly known nor accessed by unauthorized individuals.

42. In conjunction with the health services MAPS provides, MAPS collects Private Information from the patients it provides services to, including Plaintiffs and the Class.

43. Plaintiffs and the Class entrusted their Private Information to MAPS with the mutual agreement and understanding that MAPS would protect their Private Information from unauthorized access.

44. As a healthcare provider who is a covered entity under HIPAA, MAPS should have implemented technical, organizational, and physical safeguards designed to protect the PHI and PII it collects. However, MAPS failed to take data security seriously, resulting in a massive and preventable Data Breach that exposed Plaintiffs' and the Class's Private Information to cybercriminals.

**B.** ***Defendant's Data Breach Exposed the Private Information of Plaintiffs and the Class.***

45. On or around July 15, 2025, MAPS posted the following Notice of Data Security

---

[14] *Id.*

Incident on its website ("Website Notice"):

**<u>Notice of Data Security Incident</u>**

Shawnee Mission, Kansas – July 15, 2025 – Mid America Physician Services ("MAPS"), a medical services provider providing medical care to patients in Kansas, announced it is notifying individuals whose personal information may have been involved in a network security incident. This statement is intended to notify potentially impacted individuals of the incident, steps MAPS is taking in response, and resources available to assist and protect individuals.

On or about November 14, 2024, MAPS discovered a network incident that impacted its IT systems. Immediately upon identifying the incident, MAPS engaged third-party cybersecurity experts to assess, contain, and remediate the incident. Law enforcement was also notified.

The investigation, which concluded on or around May 8, 2025, identified instances of name, address, date of birth, medical treatment information, billing information, and health insurance information exposure for certain patients as a result of this incident. While the investigation has not identified any instances of fraud or identity theft that have occurred as a result of this incident, out of an abundance of caution, MAPS is notifying individuals whose personal information may have been involved and providing resources they can use to help protect their information.

MAPS takes its responsibility to safeguard personal information seriously and regrets any concern this incident may have caused. As part MAPS' ongoing commitment to information security, the organization has taken steps to help reduce the likelihood of a similar event in the future.

As a general precaution, the following practices can help to protect you from medical identity theft.

- Only share your health insurance cards with your health care providers and other family members who are covered under your insurance plan or who help you with your medical care.
- Review your "explanation of benefits statement" which you receive from your health insurance company. Follow up with your insurance company or care provider for any items you do not recognize. If necessary, contact the care provider on the explanation of benefits statement and ask for copies of medical records to verify their accuracy and authenticity.
- Ask your insurance company for a current year-to-date report of all services paid for you as a beneficiary. Follow up with your insurance company or the care provider for any items you do not recognize.

Individuals with questions may contact the dedicated call center at 1-833-367-8552 from 8:00 am to 8:00 pm (EST), Monday through Friday.

Mid America Physician Services sincerely regrets any inconvenience or concern that this matter may cause and remains dedicated to ensuring the privacy and security of all information in its control.[15]

46.     The Website Notice obfuscates the nature of the Breach and does not disclose the full range of PII and PHI impacted. MAPS reported to the Texas Attorney General's Office that the types of Private Information accessed in the Data Breach included: names, addresses, Social Security numbers, financial information (e.g., account numbers and/or credit or debit card numbers), medical information, and/or health insurance information.[16]

47.     A covered entity under HIPAA—such as MAPS—must notify the Department of Health and Human Services ("HHS") if it discovers a breach of unsecured PHI. *See* 45 C.F.R. § 164.408. To date, however, MAPS has yet to report the Data Breach to the HHS.

48.     On or around July 14, 2025—approximately eight months after the Data Breach began—MAPS began sending Notice Letters to victims of the Data Breach.

49.     In the Notice Letters, MAPS failed to explain why it took approximately eight months for MAPS to notify victims of the Breach nor why it failed to timely detect the Breach. MAPS's failure to timely detect the Data Breach, particularly for a lengthy period of time, is indicative of poor data security infrastructure, procedures, and protocols.

50.     After receiving the Notice Letters, it is reasonable for recipients, including Plaintiffs and Class Members, to believe that the risk of future harm (including medical and

---

[15] https://www.midamericaphysicians.com/images/Elements/Notice_of_Data_Security_Incident.pdf (last visited Sept. 19, 2025).

[16] *Data Security Breach Reports*, ATTORNEY GENERAL OF TEXAS, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Sept. 19, 2025).

11

identity theft) is substantial and imminent, and that it is necessary for them to take steps to mitigate the substantial risk of impending and future harm.

51. Indeed, MAPS admonishes victims of the Data Breach to review statements received from healthcare providers and health insurance plans to determine if there are services on the statements that were not received.[17]

52. Despite stressing in the Notice Letters that Class Members monitor their statements, MAPS did not provide any complimentary credit monitoring or medical monitoring to victims of the Breach. In effect, Defendant is shirking its responsibility for the harm and increased risk of identity theft and fraud it has caused Plaintiffs and members of the Class.

53. The Breach has placed immense distress and financial burdens on the Data Breach victims.

54. Upon information and belief, cybercriminals intentionally targeted and gained access to Plaintiffs' and the Class's Private Information with the intent of engaging in misuse of the Private Information, including marketing and selling Plaintiffs' and Class Members' Private Information to fraudsters as that is the *modus operandi* of data thieves.

55. MAPS could have prevented the Data Breach—but failed to do so.

**C. *Cybercriminals Will Use Plaintiffs' and Class Members' Private Information to Defraud them.***

56. PII and PHI is of great value to hackers and cybercriminals, and the data accessed and/or acquired in the Data Breach can and will be used in a variety of ways by criminals to exploit Plaintiffs and Class Members and to profit from their misfortune.

57. Hackers want stolen medical records to commit identity theft, use the stolen data as

---

[17] *Id.*

12

a ransom, sell it on the dark web or impersonate the victim to receive medical services. Medical records are valuable to cybercriminals as they allow cybercriminals to commit fraud and go undetected longer than they can with other personally identifiable information.[18]

58. Gary Cantrell, head of investigations at the HHS Office of Inspector General, said hackers tend to steal medical records because they are "a treasure trove of [] information about you." They contain a patient's full name, address history, financial information, and social security numbers—which is enough information for hackers to take out a loan or set up a line of credit under patients' names, according to *Computerworld*.[19]

59. For example, with the PHI stolen in the Data Breach, bad actors can: (i) use the stolen PHI to visit a doctor (during an emergency, this false information could prevent the victim from receiving the treatment they need, or cause the doctor to prescribe the wrong treatment); (ii) file fraudulent insurance claims; (iii) obtain prescription drugs for the purpose of selling them on the black market; (iv) rack up large hospital bills in the victim's name, which may negatively impact the victim's credit; (v) employ phishing tactics using calls, emails or other messages that appear legitimate — to trick victims into giving up more information; and (vi) receive Medicaid or Medicare benefits in the victim's name.[20]

60. But increasingly, hackers are selling medical information for profit on the black

---

[18] Aranza Trevino, *Why Do Hackers Want Medical Records*? (Jan. 11, 2024), https://www.keepersecurity.com/blog/2024/01/11/why-do-hackers-want-medical-records/#:~:text=Hackers%20want%20stolen%20medical%20records,victim%20to%20receive%20medical%20services (last visited Sept. 19, 2025).

[19] https://www.advisory.com/daily-briefing/2019/03/01/hackers (last visited Sept. 19, 2025).

[20] https://www.idwatchdog.com/education/what-is-medical-identity-theft#:~:text=What%20can%20a%20criminal%20do,or%20purchase%20costly%20medical%20services; https://www.equifax.com/personal/education/identity-theft/articles/-/learn/medical-identity-theft/ (last visited Sept. 19, 2025).

market.[21] According to Reuters, buyers might use the information to create fake IDs to purchase medical equipment or drugs, or to file a false insurance claim.[22]

61.     These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and Class Members.

62.      Medical-related identity theft is one of the most common, most expensive, and most difficult to prevent forms of identity theft. According to Kaiser Health News, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the United States in 2013[,]" which is more than identity thefts involving banking and finance, the government and the military, or education.[23]

63.     When cybercriminals manage to steal PHI—as they did here—there is no limit to the amount of fraud to which Plaintiffs and Class Members are exposed.

64.     PHI is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it for years.[24]

65.     The Data Breach at issue here was targeted and financially motivated, as the only reason cybercriminals go through the trouble of hacking healthcare entities like MAPS is to steal the highly sensitive Private Information they maintain, which can be exploited and sold for use in the kinds of criminal activity described herein.

66.     "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place."[25]

---

[21] https://www.advisory.com/daily-briefing/2019/03/01/hackers (last visited Sept. 19, 2025).
[22] *Id.*
[23] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, KAISER HEALTH NEWS (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/ (last visited Sept. 19, 2025).
[24] *Id.*
[25] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDX (May 14, 2015) https://www.idx.us/knowledge-center/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last visited Sept. 19, 2025).

14

A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market.[26]

67. According to Experian, a patient's full medical records can sell for up to $1,000. By comparison, Social Security numbers and credit card information usually sell for $1 and up to $110, respectively.[27]

68. A Social Security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[28]

69. It is evident PHI is even more valuable on the black market than PII.[29]

70. According to the Center for Internet Security, "[t]he average cost of a data breach incurred by a non-healthcare related agency, per stolen record, is $158. For healthcare agencies the cost is an average of $355. Credit card information and PII sell for $1-$2 on the black market, but PHI can sell for as much as $363 according to the Infosec Institute. This is because one's personal health history, including ailments, illnesses, surgeries, etc., can't be changed, unlike credit card information or Social Security Numbers."[30]

71. "PHI is valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can also be used to create fake insurance claims, allowing for the purchase and resale of medical equipment.

---

[26] *Managing cyber risks in an interconnected world: Key findings from The Global State of Information Security Survey 2015*, PRICEWATERHOUSECOOPERS (Sept. 30, 2014), https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.
[27] https://www.advisory.com/daily-briefing/2019/03/01/hackers (last visited Sept. 19, 2025).
[28] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web*, PGMAG (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.
[29] *Data Breaches: In the Healthcare Sector*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited Sept. 19, 2025).
[30] *Id.*

15

Some criminals use PHI to illegally gain access to prescriptions for their own use or resale."[31]

72.     Identity theft experts advise victims of data breaches: "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[32]

73.     Hackers may not use the information right away, but this does not mean it will not be used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information **may continue for years**. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[33]

74.     For instance, with a stolen Social Security number, which Plaintiffs reasonably believes was also stolen in the Data Breach, criminals can open financial accounts, get medical care, file fraudulent tax returns, commit crimes, and steal benefits.[34]

75.     Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[35]

76.     Defendant made no offering of identity monitoring or medical monitoring to Plaintiffs and the Class. Plaintiffs and the Class are left unprotected from MAPS's negligent failure

---

[31] *Id.*

[32] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/ (last visited Sept. 19, 2025).

[33] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (July 5, 2007), https://www.gao.gov/products/gao-07-737 (emphasis added).

[34] *See* Nikkita Walker, *What Can Someone Do with Your Social Security Number?*, CREDIT.COM (Oct. 19, 2023), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[35] *Guide for Assisting Identity Theft Victims*, FEDERAL TRADE COMMISSION (Sept. 2013), https://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf.

16

to secure and protect their Private Information.

77. The unfortunate truth is the full scope of the harm has yet to be realized. There may be a time lag between when harm occurs and when it is discovered, and also between when Private Information is stolen and when it is used.

78. Plaintiffs and Class Members will need to pay for their own medical monitoring and credit monitoring for the rest of their lives due to Defendant's negligence.

79. Furthermore, identity and medical monitoring services only alert someone to the fact that they have already been the victim of identity or medical theft—it does not prevent identity or medical theft.[36]

80. Nor can identity monitoring service or a medical monitoring services remove Private Information from the dark web.[37]

81. "The people who trade in stolen personal information [on the dark web] won't cooperate with an identity theft service or anyone else, so it's impossible to get the information removed, stop its sale, or prevent someone who buys it from using it."[38]

82. As a direct and proximate result of the Data Breach, Plaintiffs and the Class have been damaged and placed at an imminent and continuing increased risk of harm from fraud and identity theft. Plaintiffs and the Class must now take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, reviewing their explanation of benefits statements, reviewing medical statements, closing or modifying financial

---

[36] *See* Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, CNBC (Nov. 30, 2017, 9:00 AM), https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html (last visited Sept. 19, 2025).
[37] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.
[38] *Id.*

accounts, and closely reviewing and monitoring bank accounts, credit reports, and medical records for unauthorized activity for years to come.

83.     Even more serious is the identity restoration that Plaintiffs and other Class Members must go through, which can require spending countless hours filing police reports, filling out IRS forms, completing Federal Trade Commission checklists and Department of Motor Vehicle driver's license replacement applications, and calling financial institutions to cancel fraudulent credit applications, to name just a few of the steps Plaintiffs and the Class must take.

84.     Plaintiffs and the Class have or will experience the following concrete and particularized harms for which they are entitled to compensation, including:

  a. Actual identity theft;

  b. Trespass, damage to, and theft of their personal property, including their Private Information;

  c. Improper disclosure and theft of their Private Information;

  d. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

  e. Loss of privacy suffered as a result of the Data Breach, including the harm of knowing cybercriminals have their Private Information;

  f. Ascertainable losses in the form of time taken to respond to identity theft and medical fraud, including lost opportunities and lost wages from uncompensated time off from work;

  g. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the Data Breach;

18

h. Ascertainable losses in the form of diminution of the value of Plaintiffs' and Class Members' Private Information, for which there is a well-established and quantifiable national and international market;

i. The loss of use of and access to their credit, accounts, medical records, and/or funds;

j. Damage to their credit due to fraudulent use of their Private Information; and/or

k. Increased cost of borrowing, insurance, deposits, and the inability to secure more favorable interest rates because of a reduced credit score.

85. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which remains in the possession of MAPS, is protected from further breaches through the implementation of industry standard security measures and safeguards. MAPS has shown itself wholly incapable of protecting Plaintiffs' and Class Members' Private Information.

86. Plaintiffs and Class Members also have an interest in ensuring that their Private Information is removed from all Defendant's servers, systems, and files.

87. The notice provided by MAPS acknowledged that the Data Breach would cause harm to affected individuals and that financial harm would likely occur.

88. At Defendant's suggestion, Plaintiffs and the Class are trying to mitigate the damages Defendant caused them.

89. Given the kind of Private Information Defendant made accessible to hackers, however, Plaintiffs are certain to incur additional damages. Because thieves have their Private Information, Plaintiffs and Class Members will need to have identity theft monitoring and medical monitoring for the rest of their lives. Some may even need to try to go through the long and arduous process of getting a new Social Security number, which is not guaranteed, with all the loss of credit

19

and employment difficulties that come with a new number.[39]

90.     None of this should have happened because the Data Breach was entirely preventable.

**D.  *Defendant was Aware of the Risk of Data Breaches.***

91.     According to the Center for Internet Security, "the health industry experiences more data breaches than any other sector."[40] This is because "Personal Health Information (PHI) is more valuable on the black market than credit card credentials or regular Personally Identifiable Information (PII). Therefore, there is a higher incentive for cyber criminals to target medical databases. They can sell the PHI and/or use it for their own personal gain."[41]

92.     "In 2023, more than 540 organizations and 112 million individuals were implicated in healthcare data breaches reported to the HHS Office for Civil Rights (OCR), compared to 590 organizations and 48.6 million impacted individuals in 2022."[42]

93.     "The number of cybersecurity attacks disrupting the healthcare sector has continued to be a growing concern. In the last three years, more than 90% of all healthcare organizations have reported at least one security breach which can manifest in denial of service, malicious code, ransomed data, and more."[43]

---

[39] *What happens if I change my Social Security number?*, LEXINGTON LAW (Aug. 10, 2022), https://www.lexingtonlaw.com/blog/credit-101/will-a-new-social-security-number-affect-your-credit.html (last visited Sept. 19, 2025).
[40]   *Data Breaches: In the Healthcare Sector*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector.
[41] *Id.*
[42]   *This Year's Largest Healthcare Data Breaches*, HEALTH IT SECURITY (Dec. 26, 2023), https://healthitsecurity.com/features/this-years-largest-healthcare-data-breaches.
[43]   *6 Industries Most Vulnerable to Cyber Attacks*, WGU (Aug. 3, 2021), https://www.wgu.edu/blog/6-industries-most-vulnerable-cyber-attacks2108.html.

94. "Healthcare organizations are rich targets for cybercriminals because they hold a large amount of sensitive patient data. This data can be used to commit identity theft or fraud or sold on the black market. Hackers can access this data in many ways, including phishing emails, malware, and unsecured networks."[44]

95. It is no secret that "[h]ealthcare data breaches are reaching record highs. Indeed, healthcare now sees more cyberattacks than any other industry. Fully one-third of all cyberattacks are aimed at healthcare institutions. Why? Because healthcare is a valuable and vulnerable target. Hospitals and healthcare institutions are a prime target for cybercrime due to the vast amount of sensitive data they hold."[45]

96. The health industry is frequently recognized as one of the most vulnerable industries for a cyberattack.[46]

97. Defendant should have been aware, and indeed was aware, that it was at risk of a data breach that could expose the Private Information that it solicited, collected, stored, and maintained, especially given the rise in data breaches.

98. Defendant was aware of the risks and harm that could result from inadequate data security but threw caution to the wind.

**E. *Defendant Fails to Comply with FTC Guidelines.***

---

[44] Troy Beamer, *What Industries Are Most Vulnerable to Cyber Attacks In 2024?*, TECHNEWS (Feb. 27, 2024), https://www.techbusinessnews.com.au/what-industries-are-most-vulnerable-to-cyberattacks-in-2022/.

[45] *What Industries Are Most Vulnerable to Cyberattacks?*, PSM, https://www.psmpartners.com/blog/most-targeted-industries-for-cyber-attacks/.

[46] *See, e.g.*, *id.*; Liudmyla Pryimenko, *The 7 Industries Most Vulnerable to Cyberattacks*, EKRAN (Mar. 25, 2024), https://www.ekransystem.com/en/blog/5-industries-most-risk-of-data-breaches; Ani Petrosyan, *Distribution of cyberattacks across worldwide industries in 2023*, STATISTA (Mar. 22, 2024), https://www.statista.com/statistics/1315805/cyber-attacks-top-industries-worldwide/; *6 Industries Most Vulnerable to Cyber Attacks*, WGU (Aug. 3, 2021), https://www.wgu.edu/blog/6-industries-most-vulnerable-cyber-attacks2108.html.

99. Data breaches are preventable.[47] "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[48] "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[49]

100. Most reported data breaches "are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures. . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[50]

101. Here, many failures laid the groundwork for the Data Breach.

102. The FTC has published guidelines that establish reasonable data security practices for businesses.[51]

103. The FTC guidelines emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.[52]

104. The FTC guidelines establish that businesses should protect the confidential information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems.[53]

---

[47] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.
[48] *Id.* at 17.
[49] *Id.* at 28.
[50] *Id.*
[51] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Sept. 19, 2025).
[52] *Id.*
[53] *Id.*

105. The FTC guidelines also recommend that businesses utilize an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating hacking attempts; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[54]

106. Upon information and belief, MAPS failed to follow reasonable and necessary industry standards to prevent a data breach, including the FTC's guidelines.

107. Upon information and belief, MAPS also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework, NIST Special Publications 800-53, 53A, or 800-171; the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in cybersecurity readiness.

108. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[55]

109. To prevent and detect the Breach, MAPS could and should have taken, as recommended by the Federal Bureau of Investigation, the following measures, but did not do so:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework

---

[54] *Id.*

[55] *See How to Protect Your Networks from RANSOMWARE*, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Sept. 19, 2025).

(SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Used application whitelisting, which only allows systems to execute programs

24

known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[56]

110. Further, MAPS could and should have taken the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks.

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net).

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

---

[56] *Id.* at 3–4.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it.

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic.[57]

111.    In addition, MAPS could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Harden internet-facing assets**

- Apply latest security updates

- Use threat and vulnerability management

---

[57] *See Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY (revised Sept. 2, 2021), https://www.cisa.gov/news-events/news/protecting-against-ransomware (internal citations omitted).

26

-       Perform regular audits

**Thoroughly investigate and remediate alerts.**

-       Prioritize and treat commodity malware infections as potential full compromise of the system

**Include IT professionals in security discussions.**

-       Ensure collaboration among security operations, security administrators, and information technology administrators to configure servers and other endpoints securely

**Build and maintain credential hygiene**

-       Use multifactor authentication or network level authentication and enforce strong, randomized, just-in-time local administrator passwords

**Apply principle of least-privilege**

-       Monitor for adversarial activities

-       Hunt for brute force attempts

-       Monitor for cleanup of Event Logs

-       Analyze logon events

**Harden infrastructure**

-       Utilize Windows Defender Firewall

-       Enable tamper protection

-       Enable cloud-delivered protection

-       Turn on attack surface reduction rules and Antimalware Scan Interface for Office Visual Basic for Applications[58]

---

[58] *See Human-operated ransomware attacks: A preventable disaster*, MICROSOFT THREAT INTELLIGENCE (Mar 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Sept. 19, 2025).

112. Given that MAPS was storing the Private Information of thousands of individuals, MAPS could and should have implemented all of the above measures to prevent and detect cyberattacks.

113. Specifically, among other failures, MAPS had far too much confidential unencrypted Private Information held on its systems. Such Private Information should have been segregated into an encrypted system.[59]

114. Moreover, it is well-established industry standard practice for a business to dispose of confidential Private Information once it is no longer needed.[60]

115. The FTC has repeatedly emphasized the importance of disposing of unnecessary Private Information: "Keep sensitive data in your system only as long as you have a business reason to have it. Once that business need is over, properly dispose of it. If it's not on your system, it can't be stolen by hackers."[61] Rather than following this basic standard of care, MAPS kept thousands of individuals' unencrypted PHI on their inadequately secured systems indefinitely.

116. In sum, the Data Breach could have been easily prevented through standard practices like the use of industry standard network segmentation and encryption of all Private Information—which MAPS negligently failed to do.

117. Further, the scope of the Data Breach could have been dramatically reduced had Defendant utilized proper record retention and destruction practices, but MAPS negligently did no such thing.

**F.  *Defendant Fails to Comply with HIPAA Guidelines.***

---

[59] *See* Adnan Raja, *How to Safeguard Your Business Data With Encryption*, DATAINSIDER (Aug. 14, 2018), https://digitalguardian.com/blog/how-safeguard-your-business-data-encryption.
[60] *See Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Sept. 19, 2025).
[61] *Id.* at 6.

28

118. As a healthcare provider handling PHI, MAPS is a covered entity under HIPAA (45 C.F.R. § 160.103). As such, MAPS is required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and the HIPAA Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C ("Security Standards for the Protection of Electronic Protected Health Information").

119. HIPAA's Privacy Rule establishes national standards for protecting health information, including health information that is kept or transferred in electronic form.

120. HIPAA's Privacy Rule allows covered entities to disclose PHI to "business associates" if the covered entity obtains satisfactory assurances that the business associate will use the information only for the purposes for which it was engaged by the covered entity, will safeguard the information from misuse, and will help the covered entity comply with some of the covered entity's duties under the Privacy Rule. The satisfactory assurances must be in writing, whether in the form of a contract or other agreement between the covered entity and the business associate.

121. A covered entity's contract or other written arrangement with its business associate must contain the elements specified at 45 CFR 164.504(e). For example, the contract must: (i) describe the permitted and required uses of protected health information by the business associate; (ii) provide that the business associate will not use or further disclose the PHI other than as permitted or required by the contract or as required by law; and (iii) require the business associate to use appropriate safeguards to prevent a use or disclosure of the protected health information other than as provided for by the contract.

122. Where a covered entity knows of a material breach or violation by the business associate of the contract or agreement, the covered entity is required to take reasonable steps to

cure the breach or end the violation, and if such steps are unsuccessful, to terminate the contract or arrangement. If termination of the contract or agreement is not feasible, a covered entity is required to report the problem to the Department of Health and Human Services (HHS) Office for Civil Rights (OCR).

123. MAPS was required to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

124. "Electronic protected health information" is "individually identifiable health information . . . that is: (i) transmitted by electronic media; [or] (ii) maintained in electronic media[.]" 45 C.F.R. § 160.103.

125. The HIPAA Security Rule, 45 C.F.R. Part 164, Subpart C, requires Defendant to:

   a. Ensure the confidentiality, integrity, and availability of all electronic protected health information it or any business associate creates, receives, maintains, or transmits;

   b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

   c. Protect against any reasonably anticipated uses or disclosures of such information; and

   d. Ensure compliance by its workforce.

126. HIPAA also requires MAPS to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information[.]" 45 C.F.R. § 164.306(e).

127. Additionally, HIPAA requires MAPS to "[i]mplement technical policies and

30

procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights[.]" 45 C.F.R. § 164.312(a)(1).

128. HIPAA requires MAPS to promulgate and implement written policies and procedures which are consistent with the privacy standards of HIPAA. 45 C.F.R. §164.530(h)(i)(1).

129. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, further requires MAPS to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of [the] breach[.]"

130. MAPS was also prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 (the "FTC Act"), from engaging in "unfair or deceptive acts or practices in or affecting commerce[.]" The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

131. MAPS is further required by various states' laws and regulations to protect Plaintiffs' and Class Members' Private Information.

132. MAPS owed a duty to Plaintiffs and the Class to design, maintain, and test its computer systems and servers to ensure that the Private Information in its possession and control was adequately secured and protected.

133. MAPS owed a duty to Plaintiffs and the Class to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees (and any others who accessed Private Information

31

within its computer systems) on how to adequately protect Private Information.

134. MAPS owed a duty to Plaintiffs and the Class to implement processes that would detect a breach of its data security systems in a timely manner.

135. MAPS owed a duty to Plaintiffs and the Class to act upon data security warnings and alerts in a timely fashion.

136. MAPS owed a duty to Plaintiffs and the Class to disclose if its computer systems and data security practices were inadequate to safeguard individuals' Private Information from theft because such an inadequacy would be a material fact in individuals' decisions to entrust Defendant with their Private Information.

137. MAPS owed a duty to Plaintiffs and the Class to disclose in a timely and accurate manner when data breaches occurred.

138. MAPS owed a duty of care to Plaintiffs and the Class because they were foreseeable and probable victims of any inadequate data security practices.

**G.** *Defendant Fails to Comply with Industry Standards.*

139. As noted above, experts studying cybersecurity routinely identify healthcare entities in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

140. Several best practices have been identified that, at a minimum, should be implemented by healthcare entities in possession of Private Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive

32

data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication

141. Other best cybersecurity practices that are standard for healthcare entities include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

142. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

143. These foregoing frameworks are existing and applicable industry standards for healthcare entities, and upon information and belief, MAPS failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**H.  *Common Injuries & Damages.***

144. As a result of MAPS's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages,

33

including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in MAPS's possession and is subject to further unauthorized disclosures so long as MAPS fails to undertake appropriate and adequate measures to protect the Private Information.

**I.** ***Loss Of Time to Mitigate Risk of Identity Theft & Fraud.***

145. As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

146. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach Accordingly, the Data Breach has caused Plaintiffs and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

147. Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in

which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[62]

148. Plaintiffs' and Class Members' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[63]

149. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[4]

**J.** *Diminution of Value of Private Information.*

150. PII and PHI are valuable property rights.[64] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

---

[62] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[63] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last accessed Sept. 19, 2025).

[64] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report") (last accessed Sept. 19, 2025).

35

151.     Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[65]

152.     An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[66]

153.     In fact, the data marketplace is so sophisticated that patients can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[67,68]

154.     Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[69]

155.     Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[70]

156.     As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and

---

[65] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[66] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[67] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Sept. 19, 2025).

[68] https://datacoup.com/ (last visited Sept. 19, 2025).

[69] https://digi.me/what-is-digime/

[70]         *Medical         I.D.         Theft*,         EFraudPrevention https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20yo ur,credit%20report%20may%20be%20affected (last visited Sept. 19, 2025).

diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

157. At all relevant times, MAPS knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if MAPS's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

158. The fraudulent activity resulting from the Data Breach may not come to light for years.

159. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

160. MAPS was, or should have been, fully aware of the unique type and the significant volume of data on MAPS's network, amounting to, upon information and belief, thousands of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

161. The injuries to Plaintiffs and Class Members were directly and proximately caused by MAPS's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

**K. *Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary.***

37

162.    Given the type of targeted attack in this case, sophisticated criminal activity, and the type of Private Information involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – *e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

163.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

164.    Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

165.    The retail cost of credit monitoring and identity theft monitoring can cost around $200.00 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from MAPS's Data Breach.

**L.   *Loss of Benefit of the Bargain.***

166.    MAPS's inadequate data security practices deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay MAPS and/or its agents for medical services, Plaintiff and other reasonable patients understood and expected that they were, in part, paying for the services and necessary data security to protect the Private Information, when in fact, MAPS did not provide the expected data security. Accordingly, Plaintiff and Class Members received

services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with MAPS.

**M.** *Plaintiffs' Individual Experiences.*

    **i.**    ***Plaintiff F.C.***

167.    Plaintiff F.C. is a patient of MAPS. To receive medical services, Plaintiff F.C. was required to provide her Private Information to MAPS, which was then stored on MAPS's computer systems and networks.

168.    By soliciting and accepting Plaintiffs F.C.'s Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

169.    Plaintiff F.C. received a Notice Letter from Defendant dated July 14, 2025, advising Plaintiff that her Private Information was compromised in the Data Breach, including Plaintiff's name, address, date of birth, health insurance information, billing information, and medical treatment information.

170.    MAPS was in possession of Plaintiffs F.C.'s Private Information before, during, and after the Data Breach.

171.    Plaintiff F.C. reasonably understood and expected that MAPS would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff F.C. would not have allowed MAPS, or anyone in MAPS's position, to maintain her Private Information if she believed that MAPS would fail to implement reasonable and industry standard practices to safeguard her Private Information from unauthorized access and exfiltration.

172.    Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, MAPS offered Data Breach victims a temporary subscription to a credit monitoring service.

173. Plaintiff F.C. greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff F.C. is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

174. Plaintiff F.C. stores any documents containing her Private Information in a safe and secure location and diligently chooses unique usernames and passwords for her online accounts.

175. As a result of the Data Breach, Plaintiff F.C. has experienced an uptick in spam calls, text messages, and emails.

176. As a result of the Data Breach, Plaintiff F.C. has spent several hours monitoring her accounts, checking her credit monitoring services, and other necessary mitigation efforts. This is valuable time that Plaintiff F.C. spent at MAPS's direction and that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

177. The Data Breach has caused Plaintiff F.C. to suffer fear, anxiety, and stress, which has been compounded by MAPS's delay in noticing her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

178. Plaintiff F.C. anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff F.C. will continue to be at present and continued increased risk of identity theft and fraud for years to come.

179. Plaintiff F.C. has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in MAPS's possession, is protected and safeguarded from future breaches.

180. As a direct and traceable result of the Data Breach, Plaintiff F.C. suffered actual

injury and damages after her Private Information was compromised in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of the bargain because MAPS did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has likely been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that MAPS obtained from Plaintiff; and (vii) other economic and non-economic harm.

181. Absent Court intervention, Plaintiff F.C.'s Private Information will be wholly unprotected and at risk of future data breaches.

## ii. Plaintiff L.H.

182. Plaintiff L.H. is a patient of MAPS. To receive medical services, Plaintiff L.H. was required to provide her Private Information to MAPS, which was then stored on MAPS's computer systems and networks.

183. By soliciting and accepting Plaintiffs L.H.'s Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

184. Plaintiff L.H. received a Notice Letter from Defendant dated July 14, 2025, advising Plaintiff that her Private Information was compromised in the Data Breach, including Plaintiff's name, address, date of birth, health insurance information, billing information, and medical treatment information.

185. MAPS was in possession of Plaintiffs L.H.'s Private Information before, during,

and after the Data Breach.

186. Plaintiff L.H. reasonably understood and expected that MAPS would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff L.H. would not have allowed MAPS, or anyone in MAPS's position, to maintain her Private Information if she believed that MAPS would fail to implement reasonable and industry standard practices to safeguard her Private Information from unauthorized access and exfiltration.

187. Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, MAPS offered Data Breach victims a temporary subscription to a credit monitoring service.

188. Plaintiff L.H. greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff L.H. is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

189. Plaintiff L.H. stores any documents containing her Private Information in a safe and secure location and diligently chooses unique usernames and passwords for her online accounts.

190. As a result of the Data Breach, Plaintiff L.H. has experienced an uptick in spam calls, text messages, and emails.

191. As a result of the Data Breach, Plaintiff L.H. has spent several hours monitoring her accounts, checking her credit monitoring services, and other necessary mitigation efforts. This is valuable time that Plaintiff L.H. spent at MAPS's direction and that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

192. The Data Breach has caused Plaintiff L.H. to suffer fear, anxiety, and stress, which

has been compounded by MAPS's delay in noticing her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

193. Plaintiff L.H. anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff L.H. will continue to be at present and continued increased risk of identity theft and fraud for years to come.

194. Plaintiff L.H. has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in MAPS's possession, is protected and safeguarded from future breaches.

195. As a direct and traceable result of the Data Breach, Plaintiff L.H. suffered actual injury and damages after her Private Information was compromised in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of the bargain because MAPS did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has likely been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that MAPS obtained from Plaintiff; and (vii) other economic and non-economic harm.

196. Absent Court intervention, Plaintiff L.H.'s Private Information will be wholly unprotected and at risk of future data breaches.

### iii. Plaintiff M.M.

197. Plaintiff M.M. is a patient of MAPS. To receive medical services, Plaintiff M.M. was required to provide her Private Information to MAPS, which was then stored on MAPS's computer systems and networks.

198. By soliciting and accepting Plaintiffs O.S.'s Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

199. Plaintiff M.M. received a Notice Letter from Defendant dated July 14, 2025, advising Plaintiff that her Private Information was compromised in the Data Breach, including Plaintiff's name, address, date of birth, health insurance information, billing information, and medical treatment information.

200. MAPS was in possession of Plaintiffs M.M.'s Private Information before, during, and after the Data Breach.

201. Plaintiff M.M. reasonably understood and expected that MAPS would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff M.M. would not have allowed MAPS, or anyone in MAPS's position, to maintain her Private Information if she believed that MAPS would fail to implement reasonable and industry standard practices to safeguard her Private Information from unauthorized access and exfiltration.

202. Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, MAPS offered Data Breach victims a temporary subscription to a credit monitoring service.

203. Plaintiff M.M. greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff M.M. is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

44

204. Plaintiff M.M. stores any documents containing her Private Information in a safe and secure location and diligently chooses unique usernames and passwords for her online accounts.

205. As a result of the Data Breach, Plaintiff M.M. has experienced an uptick in spam calls, text messages, and emails.

206. As a result of the Data Breach, Plaintiff M.M. has spent several hours monitoring her accounts, checking her credit monitoring services, and other necessary mitigation efforts. This is valuable time that Plaintiff M.M. spent at MAPS's direction and that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

207. The Data Breach has caused Plaintiff M.M. to suffer fear, anxiety, and stress, which has been compounded by MAPS's delay in noticing her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

208. Plaintiff M.M. anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff M.M. will continue to be at present and continued increased risk of identity theft and fraud for years to come.

209. Plaintiff M.M. has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in MAPS's possession, is protected and safeguarded from future breaches.

210. As a direct and traceable result of the Data Breach, Plaintiff M.M. suffered actual injury and damages after her Private Information was compromised in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (ii) loss of privacy due to her Private

45

Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of the bargain because MAPS did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has likely been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that MAPS obtained from Plaintiff; and (vii) other economic and non-economic harm.

211. Absent Court intervention, Plaintiff M.M.'s Private Information will be wholly unprotected and at risk of future data breaches.

### iv.    *Plaintiff Kimberly Steakle*

212. Plaintiff Steakle is a patient of MAPS. To receive medical services, Plaintiff Steakle was required to provide her Private Information to MAPS, which was then stored on MAPS's computer systems and networks.

213. By soliciting and accepting Plaintiffs Steakle's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

214. Plaintiff Steakle received a Notice Letter from Defendant dated July 14, 2025, advising Plaintiff that her Private Information was compromised in the Data Breach, including Plaintiff's name, address, date of birth, health insurance information, billing information, and medical treatment information.

215. MAPS was in possession of Plaintiffs Steakle's Private Information before, during, and after the Data Breach.

216. Plaintiff Steakle reasonably understood and expected that MAPS would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff

Steakle would not have allowed MAPS, or anyone in MAPS's position, to maintain her Private Information if she believed that MAPS would fail to implement reasonable and industry standard practices to safeguard her Private Information from unauthorized access and exfiltration.

217.    Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, MAPS offered Data Breach victims a temporary subscription to a credit monitoring service.

218.    Plaintiff Steakle greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff Steakle is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

219.    Plaintiff Steakle stores any documents containing her Private Information in a safe and secure location and diligently chooses unique usernames and passwords for her online accounts.

220.    As a result of the Data Breach, Plaintiff Steakle has experienced an uptick in spam calls, text messages, and emails.

221.    As a result of the Data Breach, Plaintiff Steakle has spent several hours monitoring her accounts, checking her credit monitoring services, and other necessary mitigation efforts. This is valuable time that Plaintiff Steakle spent at MAPS's direction and that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

222.    The Data Breach has caused Plaintiff Steakle to suffer fear, anxiety, and stress, which has been compounded by MAPS's delay in noticing her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

223.    Plaintiff Steakle anticipates spending considerable time and money on an ongoing

basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Steakle will continue to be at present and continued increased risk of identity theft and fraud for years to come.

224. Plaintiff Steakle has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in MAPS's possession, is protected and safeguarded from future breaches.

225. As a direct and traceable result of the Data Breach, Plaintiff Steakle suffered actual injury and damages after her Private Information was compromised in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of the bargain because MAPS did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has likely been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that MAPS obtained from Plaintiff; and (vii) other economic and non-economic harm.

226. Absent Court intervention, Plaintiff Steakle's Private Information will be wholly unprotected and at risk of future data breaches.

v. *Plaintiff Susan Oakes*

227. Plaintiff Oakes is a patient of MAPS. To receive medical services, Plaintiff Oakes was required to provide her Private Information to MAPS, which was then stored on MAPS's computer systems and networks.

48

228. By soliciting and accepting Plaintiffs Oakes' Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

229. Plaintiff Oakes received a Notice Letter from Defendant dated July 14, 2025, advising Plaintiff that her Private Information was compromised in the Data Breach, including Plaintiff's name, address, date of birth, health insurance information, billing information, and medical treatment information.

230. MAPS was in possession of Plaintiffs Oakes' Private Information before, during, and after the Data Breach.

231. Plaintiff Oakes reasonably understood and expected that MAPS would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Oakes would not have allowed MAPS, or anyone in MAPS's position, to maintain her Private Information if she believed that MAPS would fail to implement reasonable and industry standard practices to safeguard her Private Information from unauthorized access and exfiltration.

232. Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, MAPS offered Data Breach victims a temporary subscription to a credit monitoring service.

233. Plaintiff Oakes greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff Oakes is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

234. Plaintiff Oakes stores any documents containing her Private Information in a safe and secure location and diligently chooses unique usernames and passwords for her online accounts.

49

235. As a result of the Data Breach, Plaintiff Oakes has experienced an uptick in spam calls, text messages, and emails.

236. As a result of the Data Breach, Plaintiff Oakes has spent several hours monitoring her accounts, checking her credit monitoring services, and other necessary mitigation efforts. This is valuable time that Plaintiff Oakes spent at MAPS's direction and that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

237. The Data Breach has caused Plaintiff Oakes to suffer fear, anxiety, and stress, which has been compounded by MAPS's delay in noticing her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

238. Plaintiff Oakes anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Oakes will continue to be at present and continued increased risk of identity theft and fraud for years to come.

239. Plaintiff Oakes has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in MAPS's possession, is protected and safeguarded from future breaches.

240. As a direct and traceable result of the Data Breach, Plaintiff Oakes suffered actual injury and damages after her Private Information was compromised in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of the bargain because MAPS did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising

50

from the increased risk of fraud and identity theft now that her Private Information has likely been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that MAPS obtained from Plaintiff; and (vii) other economic and non-economic harm.

241. Absent Court intervention, Plaintiff Oakes' Private Information will be wholly unprotected and at risk of future data breaches.

### vi. *Plaintiff Ashley Buehler*

242. Plaintiff Buehler is a patient of MAPS. To receive medical services, Plaintiff Buehler was required to provide her Private Information to MAPS, which was then stored on MAPS's computer systems and networks.

243. By soliciting and accepting Plaintiffs Buehler's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

244. Plaintiff Buehler received a Notice Letter from Defendant dated July 14, 2025, advising Plaintiff that her Private Information was compromised in the Data Breach, including Plaintiff's name, address, date of birth, health insurance information, billing information, and medical treatment information.

245. MAPS was in possession of Plaintiffs Buehler's Private Information before, during, and after the Data Breach.

246. Plaintiff Buehler reasonably understood and expected that MAPS would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Buehler would not have allowed MAPS, or anyone in MAPS's position, to maintain her Private Information if she believed that MAPS would fail to implement reasonable and industry standard practices to safeguard her Private Information from unauthorized access and exfiltration.

247. Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, MAPS offered Data Breach victims a temporary subscription to a credit monitoring service.

248. Plaintiff Buehler greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff Buehler is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

249. Plaintiff Buehler stores any documents containing her Private Information in a safe and secure location and diligently chooses unique usernames and passwords for her online accounts.

250. As a result of the Data Breach, Plaintiff Buehler has experienced an uptick in spam calls, text messages, and emails.

251. As a result of the Data Breach, Plaintiff Buehler has spent several hours monitoring her accounts, checking her credit monitoring services, and other necessary mitigation efforts. This is valuable time that Plaintiff Buehler spent at MAPS's direction and that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

252. The Data Breach has caused Plaintiff Buehler to suffer fear, anxiety, and stress, which has been compounded by MAPS's delay in noticing her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

253. Plaintiff Buehler anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Buehler will continue to be at present and continued increased risk of identity theft and fraud for years to come.

52

254. Plaintiff Buehler has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in MAPS's possession, is protected and safeguarded from future breaches.

255. As a direct and traceable result of the Data Breach, Plaintiff Buehler suffered actual injury and damages after her Private Information was compromised in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of the bargain because MAPS did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has likely been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that MAPS obtained from Plaintiff; and (vii) other economic and non-economic harm.

256. Absent Court intervention, Plaintiff Buehler's Private Information will be wholly unprotected and at risk of future data breaches.

### vii. Plaintiff Mukhlisa Iskandarova

257. Plaintiff Iskandarova is a patient of MAPS. To receive medical services, Plaintiff Iskandarova was required to provide her Private Information to MAPS, which was then stored on MAPS's computer systems and networks.

258. By soliciting and accepting Plaintiffs Iskandarova's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

259. Plaintiff Iskandarova received a Notice Letter from Defendant dated July 14, 2025,

advising Plaintiff that her Private Information was compromised in the Data Breach, including Plaintiff's name, address, date of birth, health insurance information, billing information, and medical treatment information.

260. MAPS was in possession of Plaintiffs Iskandarova's Private Information before, during, and after the Data Breach.

261. Plaintiff Iskandarova reasonably understood and expected that MAPS would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Iskandarova would not have allowed MAPS, or anyone in MAPS's position, to maintain her Private Information if she believed that MAPS would fail to implement reasonable and industry standard practices to safeguard her Private Information from unauthorized access and exfiltration.

262. Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, MAPS offered Data Breach victims a temporary subscription to a credit monitoring service.

263. Plaintiff Iskandarova greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff Iskandarova is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

264. Plaintiff Iskandarova stores any documents containing her Private Information in a safe and secure location and diligently chooses unique usernames and passwords for her online accounts.

265. As a result of the Data Breach, Plaintiff Iskandarova has experienced an uptick in spam calls, text messages, and emails.

266. As a result of the Data Breach, Plaintiff Iskandarova has spent several hours monitoring her accounts, checking her credit monitoring services, and other necessary mitigation efforts. This is valuable time that Plaintiff Iskandarova spent at MAPS's direction and that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

267. The Data Breach has caused Plaintiff Iskandarova to suffer fear, anxiety, and stress, which has been compounded by MAPS's delay in noticing her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

268. Plaintiff Iskandarova anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Iskandarova will continue to be at present and continued increased risk of identity theft and fraud for years to come.

269. Plaintiff Iskandarova has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in MAPS's possession, is protected and safeguarded from future breaches.

270. As a direct and traceable result of the Data Breach, Plaintiff Iskandarova suffered actual injury and damages after her Private Information was compromised in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of the bargain because MAPS did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has likely been stolen and published on the dark web; (vi) diminution in the value of her Private

55

Information, a form of intangible property that MAPS obtained from Plaintiff; and (vii) other economic and non-economic harm.

271. Absent Court intervention, Plaintiff Iskandarova's Private Information will be wholly unprotected and at risk of future data breaches.

***viii.*** ***Plaintiff Chelsea Roth***

272. Plaintiff Roth is a patient of MAPS. To receive medical services, Plaintiff Roth was required to provide her Private Information to MAPS, which was then stored on MAPS's computer systems and networks.

273. By soliciting and accepting Plaintiffs Roth's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

274. Plaintiff Roth received a Notice Letter from Defendant dated July 14, 2025, advising Plaintiff that her Private Information was compromised in the Data Breach, including Plaintiff's name, address, date of birth, health insurance information, billing information, and medical treatment information.

275. MAPS was in possession of Plaintiffs Roth's Private Information before, during, and after the Data Breach.

276. Plaintiff Roth reasonably understood and expected that MAPS would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Roth would not have allowed MAPS, or anyone in MAPS's position, to maintain her Private Information if she believed that MAPS would fail to implement reasonable and industry standard practices to safeguard her Private Information from unauthorized access and exfiltration.

277. Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, MAPS offered Data Breach victims a temporary subscription to

56

a credit monitoring service.

278. Plaintiff Roth greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff Roth is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

279. Plaintiff Roth stores any documents containing her Private Information in a safe and secure location and diligently chooses unique usernames and passwords for her online accounts.

280. As a result of the Data Breach, Plaintiff Roth has experienced an uptick in spam calls, text messages, and emails.

281. As a result of the Data Breach, Plaintiff Roth has spent several hours monitoring her accounts, checking her credit monitoring services, and other necessary mitigation efforts. This is valuable time that Plaintiff Roth spent at MAPS's direction and that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

282. The Data Breach has caused Plaintiff Roth to suffer fear, anxiety, and stress, which has been compounded by MAPS's delay in noticing her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

283. Plaintiff Roth anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Roth will continue to be at present and continued increased risk of identity theft and fraud for years to come.

284. Plaintiff Roth has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in MAPS's possession, is protected and safeguarded

57

from future breaches.

285. As a direct and traceable result of the Data Breach, Plaintiff Roth suffered actual injury and damages after her Private Information was compromised in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of the bargain because MAPS did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has likely been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that MAPS obtained from Plaintiff; and (vii) other economic and non-economic harm.

286. Absent Court intervention, Plaintiff Roth's Private Information will be wholly unprotected and at risk of future data breaches.

### ix. *Plaintiff Sarah Fraundorfer and her minor child I.F.*

287. Plaintiff Sarah Fraundorfer and her minor child, I.F., are patients of MAPS. To receive medical services, Plaintiffs Fraundorfer and I.F. were required to provide their Private Information to MAPS, which was then stored on MAPS's computer systems and networks.

288. By soliciting and accepting Plaintiffs Fraundorfer and I.F.'s Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

289. Plaintiffs Fraundorfer and I.F. each received a Notice Letter from Defendant dated July 14, 2025, advising Plaintiffs that their Private Information was compromised in the Data

Breach, including Plaintiffs' name, address, date of birth, health insurance information, billing information, and medical treatment information.

290. MAPS was in possession of Plaintiffs Fraundorfer and I.F.'s Private Information before, during, and after the Data Breach.

291. Plaintiff Fraundorfer reasonably understood and expected that MAPS would safeguard her and I.F.'s Private Information and timely and adequately notify her in the event of a data breach. Plaintiff Fraundorfer would not have allowed MAPS, or anyone in MAPS's position, to maintain her and I.F.'s Private Information if she believed that MAPS would fail to implement reasonable and industry standard practices to safeguard her Private Information from unauthorized access and exfiltration.

292. Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, MAPS offered Data Breach victims a temporary subscription to a credit monitoring service.

293. Plaintiff Fraundorfer greatly values her and I.F.'s privacy and Private Information and takes reasonable steps to maintain the confidentiality of her and I.F.'s Private Information. Plaintiff Fraundorfer is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

294. Plaintiff Fraundorfer stores any documents containing her and I.F.'s Private Information in a safe and secure location and diligently chooses unique usernames and passwords for her online accounts.

295. As a result of the Data Breach, Plaintiff Fraundorfer has experienced an uptick in spam calls, text messages, and emails.

296. As a result of the Data Breach, Plaintiff Fraundorfer has spent several hours

monitoring her accounts, checking her credit monitoring services, and other necessary mitigation efforts. She did the same for I.F. This is valuable time that Plaintiff Fraundorfer spent at MAPS's direction and that she otherwise would have spent on other activities, including but not limited to work and/or recreation.

297. The Data Breach has caused Plaintiff Fraundorfer and I.F. to suffer fear, anxiety, and stress, which has been compounded by MAPS's delay in noticing her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

298. Plaintiff Fraundorfer and I.F. anticipate spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff Fraundorfer and I.F. will continue to be at present and continued increased risk of identity theft and fraud for years to come.

299. Plaintiff Fraundorfer and I.F. have a continuing interest in ensuring that their Private Information, which upon information and belief, remains in MAPS's possession, is protected and safeguarded from future breaches.

300. As a direct and traceable result of the Data Breach, Plaintiff Fraundorfer and I.F. suffered actual injury and damages after their Private Information was compromised in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of the bargain because MAPS did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has likely been stolen and published on the dark web; (vi) diminution in the value of her Private

Information, a form of intangible property that MAPS obtained from Plaintiff; and (vii) other economic and non-economic harm.

301. Absent Court intervention, Plaintiffs Fraundorfer and I.F.'s Private Information will be wholly unprotected and at risk of future data breaches.

### x. *Plaintiff More*

302. Plaintiff More is a former patient of MAPS. She underwent a surgical procedure performed by the Defendant a few years ago. To receive medical services, Plaintiff More was required to provide her Private Information to MAPS, which was then stored on MAPS's computer systems and networks.

303. By soliciting and accepting Plaintiffs More's Private Information, Defendant agreed to safeguard and protect it from unauthorized access and delete it after a reasonable time.

304. Plaintiff More received a Notice Letter from Defendant dated July 14, 2025, advising Plaintiff that her Private Information was compromised in the Data Breach, including Plaintiff's name, address, date of birth, health insurance information, billing information, and medical treatment information.

305. MAPS was in possession of Plaintiffs More's Private Information before, during, and after the Data Breach.

306. Plaintiff More reasonably understood and expected that MAPS would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff More would not have allowed MAPS, or anyone in MAPS's position, to maintain her Private Information if she believed that MAPS would fail to implement reasonable and industry standard practices to safeguard her Private Information from unauthorized access and exfiltration.

61

307. Recognizing the present, immediate, and substantially increased risk of harm the victims of the Data Breach face, MAPS offered Data Breach victims a temporary subscription to a credit monitoring service.

308. Plaintiff More greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff More is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

309. Plaintiff More stores any documents containing her Private Information in a safe and secure location and diligently chooses unique usernames and passwords for her online accounts.

310. Since this Data Breach, Plaintiff More has experienced a fraudulent attack on her personal banking account in an amount of $2,000. This scam is still under investigation by her personal bank. However, it resulted in the freezing of her accounts access for approximately 2 weeks. Making matter worse, her personal and business accounts were linked causing a freeze on those accounts as well.

311. As a result of the Data Breach, Plaintiff More has experienced an uptick in spam calls, text messages, and emails.

312. As a result of the Data Breach, Plaintiff More has spent several hours monitoring her accounts, checking her credit monitoring services, and other necessary mitigation efforts. This is valuable time that Plaintiff More spent at MAPS's direction and that she otherwise would have spent on other activities, including but not limited to work and/or recreation. At this moment, she estimates spending over 20 hours of her time in an effort to deal with the hacking of her bank account and dealing with other credit issues.

313. The Data Breach has caused Plaintiff More to suffer fear, anxiety, and stress, which has been compounded by MAPS's delay in noticing her of the fact that her Private Information was accessed and/or acquired by criminals as a result of the Data Breach.

314. Plaintiff More anticipates spending considerable time and money (at this point, at least $200) on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff More will continue to be at present and continued increased risk of identity theft and fraud for years to come.

315. Plaintiff More has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in MAPS's possession, is protected and safeguarded from future breaches.

316. As a direct and traceable result of the Data Breach, Plaintiff More suffered actual injury and damages after her Private Information was compromised in the Data Breach, including, but not limited to: (i) lost time and money related to monitoring her accounts and credit reports for fraudulent activity and researching the Data Breach; (ii) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (iii) loss of the benefit of the bargain because MAPS did not adequately protect her Private Information; (iv) emotional distress because identity thieves now possess her Private Information; (v) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has likely been stolen and published on the dark web; (vi) diminution in the value of her Private Information, a form of intangible property that MAPS obtained from Plaintiff; and (vii) other economic and non-economic harm.

317. Absent Court intervention, Plaintiff More's Private Information will be wholly unprotected and at risk of future data breaches.

### xi. *Plaintiff Jennette Hansen's Experience*

318. Plaintiff Hansen was a patient of MAPS.

319. When Plaintiff Hansen became a patient, Defendant required Plaintiff Hansen provide it with substantial amounts of her Private Information.

320. On or about July 14, 2025, Plaintiff Hansen received the Notice, which told her that her Private Information had been exposed during the Data Breach. The Notice informed her that the Private Information stolen included her "name, address, date of birth, health insurance information, billing information, and medical treatment information."

321. The Notice offered Plaintiff Hansen only twelve (12) months of credit monitoring services. Twelve months of credit monitoring is not sufficient given that Plaintiff Hansen will now experience a lifetime of increased risk of identity theft, including but not limited to, potential medical fraud.

322. Plaintiff Hansen suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach and/or monitoring her accounts for fraud.

323. Plaintiff Hansen would not have provided her Private Information to Defendant had Defendant timely disclosed that its systems lacked adequate computer and data security practices to safeguard its patients' personal and health information from theft, and that those systems were subject to a data breach.

324. Plaintiff Hansen suffered actual injury in the form of having her PII and PHI compromised and/or stolen as a result of the Data Breach.

325. Plaintiff Hansen suffered actual injury in the form of damages to and diminution in the value of her personal, health, and financial information – a form of intangible property that

64

Plaintiff Hansen entrusted to Defendant for the purpose of receiving healthcare services from Defendant and which was compromised in, and as a result of, the Data Breach.

326. Plaintiff Hansen suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by her Private Information being placed in the hands of criminals.

327. Plaintiff Hansen has a continuing interest in ensuring that her Private Information, which remains in the possession of Defendant, is protected and safeguarded from future breaches. This interest is particularly acute, as Defendant's systems have already been shown to be susceptible to compromise and are subject to further attack so long as MAPS fails to undertake the necessary and appropriate security and training measures to protect its customers' Private Information.

328. As a result of the Data Breach, Plaintiff Hansen made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and researching the credit monitoring offered by Defendant. Plaintiff Hansen has spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities.

329. As a result of the Data Breach, Plaintiff Hansen has suffered anxiety as a result of the release of her PII and PHI, which she believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using her PII and PHI for purposes of committing cyber and other crimes against her including, but not limited to, fraud and identity theft. Plaintiff Hansen is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on her life.

330. Plaintiff Hansen also suffered actual injury from having her Private Information compromised as a result of the Data Breach in the form of (a) damage to and diminution in the value of her PII and PHI, a form of property that Defendant obtained from Plaintiff []; (b) violation of her privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud she now faces.

331. As a result of the Data Breach, Plaintiff Hansen anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

## V. CLASS ACTION ALLEGATIONS

332. Plaintiffs incorporate by reference all preceding factual paragraphs as if fully restated here.

333. Plaintiffs bring this action against Defendant on behalf of themselves, and all other individuals similarly situated, pursuant to Federal Rule of Civil Procedure 23. Plaintiffs assert all claims on behalf of a nationwide class (the "Class") defined as follows:

> All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach reported by Defendant in July 2025 (the "Class").

> **Missouri Subclass**

> All individuals residing in the State of Missouri whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach reported by Defendant in July 2025.

334. Both the proposed Nationwide Class and the proposed Missouri Subclass will be collectively referred to as the Class, except where it is necessary to differentiate them.

335. Excluded from the Class is Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors,

66

subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and members of their immediate families and their judicial staff members.

336. Plaintiffs reserve the right to amend or modify the above Class definition or to propose subclasses in subsequent pleadings and motions for class certification.

337. Plaintiffs anticipate the issuance of notice setting forth the subject and nature of the instant action to the proposed Class. Upon information and belief, Defendant's own business records or electronic media can be utilized for the notice process.

338. **Numerosity:** The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiffs and exclusively in the possession of Defendant, upon information and belief, thousands of individuals were impacted. The Class is identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

339. **Typicality:** Plaintiffs' claims are typical of the claims of the Class because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiffs and all members of the Class were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that gives rise to the claims of all Class Members.

340. **Adequacy:** Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the Class. Plaintiffs have retained counsel competent and highly experienced in data breach class action litigation, and Plaintiffs and Plaintiffs' counsel

67

intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

341.     **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for individual members of the Class to effectively redress Defendant's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

342.     **Commonality and Predominance:** Defendant engaged in a common course of conduct toward Plaintiffs and Class Members, in that Plaintiffs' and Class Members' Private Information was stored on the same network and unlawfully accessed in the same way. There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

    a.   Whether MAPS engaged in the wrongful conduct alleged herein;

    b.   Whether MAPS owed a duty to Plaintiffs and Class Members to adequately protect their Private Information;

    c.   Whether MAPS breached its duty to Plaintiffs and Class Members to adequately

68

protect their Private Information;

d. Whether MAPS failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

e. Whether MAPS's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

f. Whether MAPS's data security systems prior to and during the Data Breach were consistent with industry standards;

g. Whether MAPS knew or should have known that its computer and network security systems, or the computer and network security systems of its vendors, were vulnerable to cyberattacks;

h. Whether MAPS's conduct, including its failure to act, resulted in or was the proximate cause of the Data Breach;

i. Whether MAPS was negligent in permitting unencrypted Private Information belonging to thousands of individuals to be stored within its network;

j. Whether MAPS was negligent in failing to adhere to reasonable data retention policies;

k. Whether MAPS breached implied contractual duties to Plaintiffs and the Class to use reasonable care in protecting their Private Information;

l. Whether MAPS was unjustly enriched by unlawfully retaining a benefit conferred upon it by Plaintiffs and Class Members;

m. Whether MAPS should have discovered the Data Breach sooner;

n. Whether MAPS failed to adequately respond to the Data Breach, including failing

69

to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and the Class;

o. Whether MAPS continues to breach duties owed to Plaintiffs and the Class;

p. Whether Plaintiffs and the Class suffered injuries as a proximate result of MAPS's negligent actions or failures to act;

q. Whether MAPS was negligent in selecting, supervising, and/or monitoring MAPS;

r. Whether Plaintiffs and the Class are entitled to recover damages, equitable relief, and other relief; and

s. Whether Defendant's actions alleged herein constitute gross negligence, and whether Plaintiffs and Class Members are entitled to punitive damages.

343. MAPS has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class wide basis.

344. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses. Class Members have already been preliminarily identified and sent notice of the Data Breach from MAPS.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (Alleged Against Defendant on Behalf of Plaintiffs and the Class)

345. Plaintiffs re-allege and incorporate by reference the allegations in the forgoing paragraphs as though fully set forth herein.

346. MAPS solicited, collected, stored, and maintained the Private Information of Plaintiffs and Class Members on inadequately secured computer systems and networks.

70

347. Upon accepting and storing Plaintiffs' and Class Members' Private Information on its computer systems and networks, MAPS undertook and owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information from unauthorized access and disclosure.

348. MAPS owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the Private Information.

349. MAPS's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

350. MAPS had full knowledge of the sensitivity of the Private Information in its possession and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully accessed or disclosed. Plaintiffs and Class Members were therefore the foreseeable victims of any inadequate data security practices.

351. MAPS's duty to implement and maintain reasonable data security practices arose as a result of the special relationship that exists between MAPS and consumers, which is recognized by laws and regulations, including, but not limited to, HIPAA, the FTC Act, industry standards, and common law.

352. MAPS was in a superior position to ensure its data security practices were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a data breach.

353. MAPS knew Plaintiffs and Class Members relied on it to protect their Private Information. Plaintiffs and Class Members were not in a position to assess the data security

practices used by MAPS. Because they had no means to identify MAPS's security deficiencies, Plaintiffs and Class Members had no opportunity to safeguard their Private Information from cybercriminals. MAPS exercised control over the Private Information stored on its systems and networks; accordingly, MAPS was best positioned and most capable of preventing the harms caused by the Data Breach.

354. MAPS was aware, or should have been aware, of the fact that cybercriminals routinely target healthcare entities, through cyberattacks in an attempt to steal valuable Private Information. In other words, MAPS knew of a foreseeable risk to its data security systems but failed to implement reasonable security measures.

355. MAPS owed Plaintiffs and Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when obtaining, storing, using, and managing their Private Information, including taking action to reasonably safeguard or delete such data and providing notification to Plaintiffs and Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

356. MAPS's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to such risk, or defeats protections put in place to guard against that risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B.

357. MAPS had a duty to protect and safeguard the Private Information of Plaintiffs and the Class from unauthorized access and disclosure. Additionally, MAPS owed Plaintiffs and the Class a duty:

    a. to exercise reasonable care in designing, implementing, maintaining, monitoring,

72

and testing its networks, systems, protocols, policies, procedures and practices to ensure that Plaintiffs' and Class Members' Private Information was adequately secured from impermissible release, disclosure, and publication;

b. to protect Plaintiffs' and Class Members' Private Information by using reasonable and adequate data security practices and procedures;

c. to implement processes to quickly detect a data breach, security incident, or intrusion involving its networks and servers; and

d. to promptly notify Plaintiffs and Class Members of any data breach, security incident, or intrusion that affected or may have affected their Private Information.

358. MAPS breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information.

359. The specific negligent acts and omissions committed by MAPS include, but are not limited to:

a. Failing to adopt, implement, and maintain adequate data security measures to safeguard Plaintiffs' and Class Members' Private Information;

b. Failing to adequately monitor the security of its accounts, networks, and systems;

c. Failing to ensure its servers had plans in place to maintain reasonable data security safeguards;

d. Failing to implement and maintain adequate mitigation policies and procedures;

e. Allowing unauthorized access to Plaintiffs' and Class Members' Private Information;

f. Failing to detect in a timely manner that Plaintiffs' and Class Members' Private Information had been compromised; and

73

g. Failing to timely notify Plaintiffs and Class Members about the Data Breach so they could take appropriate steps to mitigate the potential for identity theft and other damages.

360. MAPS's willful failure to abide by its duties to Plaintiffs and Class Members was wrongful, reckless, and grossly negligent considering the foreseeable risks and known threats

361. It was foreseeable that MAPS's failure to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would result in injury to Plaintiffs and Class Members.

362. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare and tech industries.

363. As a direct and proximate result of MAPS's negligent conduct, including, but not limited to, its failure to implement and maintain reasonable data security practices and procedures as described above, Plaintiffs and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

364. Through MAPS's acts and omissions described herein, including but not limited to MAPS's failure to protect the Private Information of Plaintiffs and Class Members from being stolen and misused, MAPS unlawfully breached its duty to use reasonable care to adequately protect and secure the Private Information of Plaintiffs and Class Members while it was within MAPS's possession and control.

365. Further, through its failure to provide timely and clear notification of the Data Breach to Plaintiffs and Class Members, MAPS prevented Plaintiffs and Class Members from taking meaningful, proactive steps to secure their Private Information and mitigate the impact of the Data Breach.

366. Plaintiffs and Class Members could have taken actions earlier had they been timely notified of the Data Breach.

367. Plaintiffs and Class Members could have enrolled in credit monitoring, medical monitoring, instituted credit freezes, and changed their passwords, among other things, had they been alerted to the Data Breach more quickly.

368. Plaintiffs and Class Members suffered harm from MAPS's delay in notifying them of the Data Breach.

369. As a direct and proximate result of MAPS's conduct, including, but not limited to, MAPS's failure to implement and maintain reasonable data security practices and procedures, Plaintiffs and Class Members have suffered or will suffer injury and damages, including, but not limited to: (i) the loss of the opportunity to determine for themselves how their Private Information is used; (ii) the publication and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, medical theft, fraud, and/or unauthorized use of their Private Information, including the need for substantial credit monitoring and medical monitoring services for an extended period of time; (iv) lost time and opportunity costs associated with efforts expended to address and mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from medical fraud and identity theft; (v) costs associated with placing freezes, reviewing medical statements, reviewing credit reports and changing passwords; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in MAPS's possession and is subject to further unauthorized disclosures so long as MAPS fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; and (viii) future

75

costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives. Thus, Plaintiffs and the Class are entitled to damages in an amount to be proven at trial.

370. The damages Plaintiffs and the Class have suffered and will suffer (as alleged above) were and are the direct and proximate result of MAPS's negligent conduct.

371. Plaintiffs and the Class have suffered cognizable injuries and are entitled to actual, consequential, nominal, and punitive damages in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**<u>(Alleged Against Defendant on Behalf of Plaintiffs and the Class)</u>**

372. Plaintiffs re-allege and incorporate the allegations in the forgoing paragraphs as though fully set forth herein.

373. MAPS had a duty to implement and maintain reasonable data security practices pursuant to Section 5 of the FTC Act, 15 U.S.C. § 45(a), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect sensitive and confidential data.

374. The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as MAPS, for failing to use reasonable measures to protect PII/Private Information. The FTC publications and orders described above also formed part of the basis of MAPS's duty in this regard.

375. MAPS solicited, collected, stored, and maintained Plaintiffs' and Class Members' Private Information as part of its regular business, which affects commerce.

376. MAPS violated the FTC Act by failing to use reasonable measures to protect

76

Plaintiffs' and Class Members' Private Information and by failing to comply with applicable industry standards, as described herein.

377. MAPS breached its duties to Plaintiffs and the Class under the FTC Act by failing to implement and maintain fair, reasonable, and adequate data security practices to safeguard Plaintiffs' and Class Members' Private Information, and by failing to provide prompt notice of the Data Breach without unreasonable delay.

378. MAPS's multiple failures to comply with applicable laws and regulations constitutes negligence *per se*.

379. Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

380. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, like MAPS, that fail to employ reasonable data security measures and avoid unfair and deceptive practices, causing the same harm as that suffered by Plaintiffs and the Class.

381. MAPS breached its duties to Plaintiffs and the Class by unreasonably delaying and failing to provide notice of the Data Breach expeditiously and/or as soon as practicable to Plaintiffs and the Class.

382. MAPS's violations of the FTC Act constitute negligence *per se*.

383. As a direct and proximate result of MAPS's negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, damages arising from the Data Breach, as alleged above.

384. The injury and harm that Plaintiffs and Class members suffered (as alleged above) was the direct and proximate result of MAPS's negligence *per se*.

385. MAPS also had a duty to use reasonable security measures under HIPAA, which requires covered entities to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this action constitutes "protected health information" within the meaning of HIPAA.

386. Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Private Information. HHS subsequently promulgated multiple regulations under the authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.304, 45 C.F.R. § 164.306(a)(1-4), 45 C.F.R. § 164.312(a)(1), 45 C.F.R. § 164.308(a)(1)(i), 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

387. MAPS's violations of HIPAA constitute negligence *per se*.

388. Plaintiffs and the Class are within the class of persons HIPAA was intended to protect.

389. The harm that occurred as a result of the Data Breach is the type of harm HIPAA was intended to guard against.

390. MAPS's duty to use reasonable care in protecting Plaintiffs' and Class Members' Private Information arose not only as a result of the statutes and regulations described above, but also because MAPS is bound by industry standards to protect and secure Private Information in its possession and control.

391. As a direct and proximate result of MAPS's negligence *per se*, Plaintiffs and the

Class have suffered and will suffer injury, including but not limited to: (i) actual instances of identity theft or fraud; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information; (iv) lost time and opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach, including, but not limited to, time and resources spent researching how to prevent, detect, contest, and recover from medical fraud and identity theft; (v) costs associated with placing or removing freezes on credit reports; (vi) the continued risk to their Private Information, which remains in MAPS's possession and is subject to further unauthorized disclosures so long as MAPS fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the ongoing impact of the Data Breach for the remainder of the lives of Plaintiffs and the Class.

392. Additionally, as a direct and proximate result of MAPS's negligence *per se*, Plaintiffs and the Class have suffered and will suffer imminent and impending injuries arising from the increased risk of future fraud and identity theft.

393. As a direct and proximate result of MAPS's negligence *per se*, Plaintiffs and the Class are entitled to recover actual, consequential, nominal, and punitive damages in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**<u>(Alleged Against Defendant on Behalf of Plaintiffs and the Class)</u>**

394. Plaintiffs re-allege and incorporate the allegations in the forgoing paragraphs as though fully set forth herein.

79

395. MAPS solicited, collected, stored, and maintained Plaintiffs' and Class Members' Private Information as part of MAPS's regular business practices.

396. Plaintiffs and Class Members were required to provide their Private Information to MAPS to receive medical services. Plaintiffs and Class Members paid money, or money was paid on their behalf, to MAPS in exchange for medical services.

397. MAPS solicited and accepted possession of Plaintiffs' and Class Members' Private Information for the purpose of providing medical services to Plaintiffs and Class Members.

398. In delivering, directly or indirectly, their Private Information to MAPS and paying for healthcare services, Plaintiffs and Class Members intended and understood that MAPS would adequately safeguard their Private Information.

399. Plaintiffs and Class Members reasonably expected that the Private Information they entrusted to MAPS, to receive medical services, would remain confidential and would not be shared or disclosed to criminal third parties or vendors with inadequate data security.

400. Upon information and belief, MAPS maintained privacy policies governing the Private Information of Plaintiffs and Class Members.

401. Plaintiffs and Defendant had a mutual understanding that MAPS would ensure any third parties it hired, implemented and maintained adequate and reasonable data security practices and procedures to protect Plaintiffs' and Class Members' sensitive Private Information.

402. Plaintiffs and MAPS also shared an expectation and understanding that MAPS would not share or disclose, whether intentionally or unintentionally, the sensitive Private Information in its possession and control with third parties who had inadequate data security.

403. Based on MAPS's representations, legal obligations, and acceptance of Plaintiffs' and Class Members' Private Information, MAPS had a duty to safeguard the Private Information

80

in its possession by ensuring all vendors it utilized employed reasonable data security practices.

404. When Plaintiffs and Class Members paid money and provided their Private Information to MAPS, either directly or indirectly, in exchange for goods or services, they entered into implied contracts with MAPS.

405. MAPS entered into implied contracts with Plaintiffs and the Class under which MAPS agreed to comply with its statutory and common law duties to safeguard and protect Plaintiffs' and Class Members' Private Information and to timely notify Plaintiffs and Class Members of a data breach.

406. The implied promise of confidentiality includes consideration beyond those pre-existing duties owed under HIPAA and other state and federal regulations.

407. The implied promises include, but are not limited to: (i) taking steps to ensure any agents or vendors who are granted access to Private Information protect the confidentiality of that information; (ii) taking steps to ensure that Private Information in the possession and control of Defendant, its agents, and/or vendors is restricted and limited to achieve an authorized medical purpose; (iii) restricting access to qualified and trained agents and/or vendors; (iv) designing and implementing appropriate retention policies to protect the Private Information from unauthorized access and disclosure; (v) applying or requiring proper encryption of the Private Information; (vi) requiring multifactor authentication for access to the Private Information; and (vii) other steps necessary to protect against foreseeable data breaches.

408. Plaintiffs and Class Members would not have entrusted their Private Information to MAPS in the absence of such implied contracts.

409. MAPS knew that Plaintiffs' and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance to Plaintiffs

and Class Members.

410. Plaintiffs and Class Members fully performed their obligations under the implied contracts with MAPS.

411. MAPS breached the implied contracts with Plaintiffs and Class Members by failing to safeguard Plaintiffs' and Class Members' Private Information.

412. As a direct and proximate result of MAPS's breach of the implied contracts, Plaintiffs and Class Members have suffered damages, including foreseeable consequential damages that MAPS knew about when it solicited and collected Plaintiffs' and Class Members' Private Information.

413. Plaintiffs and the Class have suffered injuries as described herein, and are entitled to actual and punitive damages, statutory damages, and reasonable attorneys' fees and costs, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
## UNJUST ENRICHMENT
### (Alleged Against Defendant on Behalf of Plaintiffs and the Class)

414. Plaintiffs re-allege and incorporate the allegations in the forgoing paragraphs as though fully set forth herein.

415. Plaintiffs allege this claim in the alternative where necessary.

416. Plaintiffs and the Class provided their Private Information to receive medical services.

417. By conferring their Private Information, Plaintiffs and Class Members reasonably understood MAPS would be responsible for safeguarding their Private Information from unauthorized access and disclosure, including selecting vendors with adequate data security.

82

Plaintiffs also understood MAPS would responsibly safeguard and store their Private Information and employ adequate data security.

418.  Upon information and belief, MAPS funds its data security measures entirely from its general revenue, including from money it from Plaintiffs and Class Members.

419.  Plaintiffs and Class Members paid MAPS a certain sum of money, which was used to fund data security.

420.  As such, a portion of the payments made by or on behalf of Plaintiffs and the Class was to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

421.  There is a direct nexus between money paid to Defendant and the requirement that MAPS keep Plaintiffs' and Class Members' Private Information confidential and protected from unauthorized access and disclosure.

422.  Protecting the Private Information of Plaintiffs and Class Members is integral to MAPS's business. Without their Private Information, MAPS would be unable to provide services comprising MAPS's core business.

423.  Plaintiffs' and Class Members' Private Information have monetary value.

424.  Plaintiffs and Class Members directly conferred a monetary benefit on MAPS. Plaintiffs and Class Members directly conferred a monetary benefit on MAPS by supplying their Private Information, from which MAPS derives its business, and which should have been protected with adequate data security.

425.  MAPS solicited, collected, stored, and maintained Plaintiffs' and Class Members' Private Information, and as such, MAPS had direct knowledge of the monetary benefits conferred

83

upon them by Plaintiffs and the Class. MAPS profited from these transactions and used Plaintiffs' and Class Members' Private Information for business purposes.

426. Indeed, Plaintiffs and Class Members who were patients of MAPS provided monetary payments to MAPS and therefore conferred a benefit unto Defendant.

427. MAPS appreciated that a monetary benefit was being conferred on it by Plaintiffs and Class Members and accepted that monetary benefit.

428. Under the facts and circumstances outlined above, however, it is inequitable for MAPS to retain that benefit without payment of the value thereof.

429. MAPS enriched itself by saving the costs it reasonably should have expended on data security measures and vendors with adequate data security to secure Plaintiffs' and Class Members' Private Information.

430. Instead of providing a reasonable level of security that would have prevented the Data Breach, MAPS calculated to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and vendors. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of MAPS's decisions to prioritize its own profits over the requisite data security and vendors with requisite data security.

431. Under the principles of equity and good conscience, MAPS should not be permitted to retain the monetary benefit belonging to Plaintiffs and Class Members because MAPS failed to implement appropriate data management and security measures and/or failed to utilize vendors who implemented appropriate data management and security measures.

432. MAPS acquired Plaintiffs' and Class Members' Private Information through inequitable means. MAPS failed to disclose its inadequate data security practices.

433. If Plaintiffs and Class Members knew that MAPS had not secured their Private

Information, they would not have allowed MAPS to collect their Private Information.

434. Plaintiffs and Class Members have no adequate remedy at law.

435. As a direct and proximate result of MAPS's conduct, Plaintiffs and Class Members have suffered or will suffer injury, including, but not limited to: (i) actual identity theft and fraud; (ii) loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, medical fraud, and/or unauthorized use of their Private Information; (v) lost time and opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach, including, but not limited to, effort and time spent researching how to prevent, detect, contest, and recover from identity theft and medical fraud; (vi) the continued risk to their Private Information, which remains in MAPS's possession and is subject to further unauthorized disclosures so long as MAPS fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; and/or (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

436. As a direct and proximate result of MAPS's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

437. MAPS should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, all gains that they unjustly received.

**FIFTH CAUSE OF ACTION**
**INVASION OF PRIVACY**
**(Alleged Against Defendant on Behalf of Plaintiffs and the Class)**

438. Plaintiffs re-allege and incorporate the allegations in the forgoing paragraphs as

though fully set forth herein.

439. Plaintiffs and Class Members took reasonable and appropriate steps to keep their Private Information confidential from the public.

440. Plaintiffs' and Class Members' efforts to safeguard their own Private Information were successful, as their Private Information was not known to the public prior to the Data Breach.

441. Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

442. MAPS owed a duty to its patients, including Plaintiff and the proposed Class Members, to keep their Private Information confidential.

443. The unauthorized release of Private Information is highly offensive to any reasonable person.

444. Plaintiffs' and Class Members' Private Information is not of legitimate concern to the public.

445. MAPS knew or should have known that Plaintiffs' and Class Members' Private Information was private.

446. By intentionally failing to keep Plaintiffs' and Class Members' PII safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, MAPS intentionally invaded Plaintiffs' and Class Members' privacy by:

    a.    Intentionally and substantially intruding into Plaintiffs' and Class Members' private affairs in a manner that identifies Plaintiff and Class Members and that would be highly offensive and objectionable to an ordinary person;

    b.    Intentionally publicizing private facts about Plaintiff and Class Members,

86

which is highly offensive and objectionable to an ordinary person; and

c.      Intentionally causing anguish or suffering to Plaintiff and Class Members.

447.    As the Restatement explains, as used throughout the Restatement of Torts, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, cmt. A (1964). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Id.* cmt. B.

448.    Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, MAPS was substantially certain that its failure to implement reasonable cybersecurity standards would lead to an invasion of Plaintiffs' privacy.

449.    MAPS knew that an ordinary person in Plaintiffs' or Class Members' position would consider the exposure of their PII and PHI to be highly offensive and objectionable.

450.    MAPS invaded Plaintiffs' and Class Members' right to privacy and intruded into Plaintiffs' and Class Members' private affairs by intentionally misusing and/or disclosing their Private Information without their informed, voluntary, affirmative, and clear consent.

451.    Moreover, given that stolen PHI is then publicized and traded on the dark web and through Telegram channels, MAPS knew or was substantially certain that its failure to implement reasonable cybersecurity safeguards would lead to the publication of Plaintiffs' and the Class Members' PHI to a large group of the public and/or to a large group of individuals who are in a special relationship with Plaintiffs' and the proposed Class Members, in that those individuals are exactly the type of people that Plaintiffs and the Class Members have a special interest in ensuring their PHI is kept confidential from given that those individuals are known identity thieves and

fraudsters.

452. The conduct described above was at or directed at Plaintiffs and the Class Members.

453. As a proximate result of such intentional misuse and disclosures, Plaintiffs' and Class Members' reasonable expectations of privacy in their Private Information was unduly frustrated and thwarted. MAPS's conduct amounted to a substantial and serious invasion of Plaintiffs' and Class Members' protected privacy interests causing anguish and suffering such that an ordinary person would consider MAPS's intentional actions or inaction highly offensive and objectionable.

454. In failing to protect Plaintiffs' and Class Members' Private Information, and in intentionally misusing and/or disclosing their Private Information, MAPS acted with intentional malice and oppression and in conscious disregard of Plaintiffs' and Class Members' rights to have such information kept confidential and private. Plaintiffs therefore seek an award of damages on behalf of themselves and the Class.

455. Unless and until enjoined, and restrained by order of this Court, MAPS's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that MAPS's inadequate data security measures will likely result in additional data breaches. Plaintiffs and Class Members have no adequate remedy at law for the injuries that they will sustain in that a judgment for monetary damages will not prevent further invasions of the Plaintiffs' and Class Members' privacy by MAPS.

**SIXTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(Alleged Against Defendant on Behalf of Plaintiffs and the Class)**

456. Plaintiffs re-allege and incorporate the allegations in forgoing paragraphs as though fully set forth herein.

88

457. In light of the special relationship between MAPS, as a medical provider, and Plaintiffs and Class Members, MAPS became a fiduciary by undertaking guardianship of Plaintiffs' and Class Members' Private Information.

458. A physician has a fiduciary duty to not disclose a patient's medical information.

459. MAPS became a fiduciary, created by its undertaking and guardianship of Plaintiffs' and the Class Members' Private Information, to act primarily for the benefit of Plaintiffs and Class Members.

460. This duty included the obligation and responsibility to:

   a. safeguard Plaintiffs' and Class Members' Private Information;

   b. timely notify Plaintiffs and the Class in the event of a data breach;

   c. only utilize vendors with adequate data security infrastructure, procedures, and protocols; and

   d. establish and implement appropriate oversight and monitoring procedures for the activities of its vendors.

461. In order to provide Plaintiffs and Class Members medical services, MAPS required that Plaintiffs and Class Members provide their Private Information to MAPS.

462. MAPS knowingly undertook the responsibility and duties related to the possession of Plaintiffs' and Class Members' Private Information, for the benefit of Plaintiffs and Class Members and in order to provide Plaintiffs and Class Members with medical services.

463. MAPS had a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of its relationship with them.

89

464.     MAPS breached the fiduciary duties it owed to Plaintiffs and Class Members by failing to protect Plaintiffs' and Class Members' Private Information by using a vendor with inadequate data security—MAPS.

465.     MAPS further breached the fiduciary duties it owed to Plaintiffs and Class Members by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach and by utilizing a vendor with inadequate data security infrastructure, procedures, and protocols.

466.     As a direct and proximate result of MAPS's breaches of its fiduciary duties, Plaintiffs and Class Members have suffered or will suffer concrete injury, including, but not limited to: (i) actual misuse of their Private Information in the form of identity theft and fraud; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach, including, but not limited to, time and effort spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in MAPS's possession and is subject to further unauthorized disclosures so long as MAPS fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

467.     As a direct and proximate result of MAPS's breach of its fiduciary duties, Plaintiffs and Class members have suffered and will continue to suffer other forms of injury and/or harm,

90

and other economic and non-economic losses.

**SEVENTH CAUSE OF ACTION**
**VIOLATIONS OF MISSOURI MERCHANDISING PRACTICES ACT,**
**MO. REV. STAT. § 407.010 *et seq*.**
**(Alleged Against Defendant on Behalf of the Missouri Plaintiffs and Missouri Subclass)**

468. Plaintiffs F.C., L.H., and M.M. ("Missouri Plaintiffs") re-allege and incorporate the allegations in the forgoing paragraphs as though fully set forth herein.

469. RSMo. 407.020 prohibits the use of any "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale of advertisement of any merchandise in trade or commerce. . ."

470. An "unfair practice" is defined by Missouri law, 15 CSR 60-8.020, as any practice which:

(A) Either –

    1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by Federal Trade Commission, or its interpretive decisions; or

    2. Is unethical, oppressive or unscrupulous; and

(B) Presents a risk of, or causes, substantial injury to consumers.

471. 15 CSR 60-8.040 provides that "Unfair Practice" is:

An unfair practice for any person in connection with the advertisement or sale of merchandise to violate the duty of good faith in solicitation, negotiation and performance, or in any manner fail to act in good faith.

472. Missouri Plaintiffs and Subclass Members and Defendant are "persons" within the meaning of section 407.010.

473. Merchandise is defined by the MMPA, to include the providing of "services" and, therefore, encompasses healthcare services. Healthcare services are a good.

91

474. Efforts to maintain the privacy and confidentiality of medical records are part of the healthcare services associated with a good.

475. Maintenance of medical records are "merchandise" within the meaning of section 407.010(4).

476. Missouri Plaintiffs' and the Missouri Subclass Members' goods and services purchased from MAPS were for "personal, family or household purposes" within the meaning of the Missouri Merchandising Practices Missouri Revised Statutes.

477. As set forth herein, MAPS's acts, practices and conduct violate section 407.010(1) in that, among other things, MAPS has used and/or continues to use unfair practices, concealment, suppression and/or omission of material facts in connection with the advertising, marketing, and offering for sale of services associated with healthcare services. Such acts offend the public policy established by Missouri statute and constitute an "unfair practice" as that term is used in Missouri Revised Statute 407.020(1).

478. MAPS's unfair, unlawful, and deceptive acts, practices and conduct include: (i) representing to their patients that it will not disclose their sensitive personal health information to an unauthorized third party or parties; (ii) failing to implement security measures such as securing the records in a safe place; (iii) failing to train personnel; and (iv) charging patients for privacy services which were not provided.

479. MAPS's conduct also violates the enabling regulations for the MMPA because it: (i) offends public policy; (ii) is unethical, oppressive and unscrupulous; (iii) causes substantial injury to consumers; (iv) it is not in good faith; (v) is unconscionable; and (vi) is unlawful. *See* Mo Code Regs. Ann. Tit. 15, Section 60-8.

480. As a direct and proximate cause of MAPS's unfair and deceptive acts, Missouri

Plaintiffs and the Missouri Subclass Members suffered damages in that they (1) paid more for medical record privacy protections that they otherwise would have, and (2) paid for medical record privacy protections that they did not receive. In this respect, Missouri Plaintiffs and the Missouri Subclass Members have not received the benefit of the bargain and have suffered an ascertainable loss.

481. Missouri Plaintiffs and the Missouri Subclass seek actual damages for all monies paid to Defendant in violation of the MMPA. In addition, Missouri Plaintiffs and the Missouri Sublass seek attorneys' fees.

**EIGHTH CAUSE OF ACTION**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(Alleged Against Defendant on Behalf of Plaintiffs and the Class)**

482. Plaintiffs re-allege and incorporate the allegations in the forgoing paragraphs as though fully set forth herein.

483. MAPS owed and still owes a duty of care to Plaintiffs and Class Members that requires it to adequately secure Plaintiffs' and Class Members' Private Information.

484. Upon information and belief, MAPS still possesses Plaintiffs' and Class Members' Private Information.

485. MAPS has not satisfied its legal duties to Plaintiffs and Class Members.

486. Since the Data Breach, MAPS has not announced any changes to its data security infrastructure, processes or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and go undetected and, thereby, prevent further attacks.

487. MAPS has not satisfied its legal duties to Plaintiffs and the Class. In fact, now that MAPS's insufficient data security is known to hackers, the Private Information in MAPS's

93

possession is even more vulnerable to cyberattacks.

488. Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their Private Information and MAPS's failure to address the security failings that led to such exposure.

489. There is no reason to believe that MAPS's data security measures are any more adequate now than they were before the Data Breach.

490. Plaintiffs and the Class, therefore, seek a declaration (1) that MAPS's existing security measures do not comply with its obligations and duties of care to provide adequate security, and (2) that to comply with its obligations and duties of care, MAPS must implement and maintain reasonable security measures, including, but not limited to:

    a. Ordering that MAPS engage third-party security auditors and penetration testers, as well as internal security personnel, to conduct testing, including simulated attacks, penetration tests, and audits on MAPS's systems on a periodic basis, and ordering MAPS to promptly correct any problems or issues detected by such third-party security auditors;

    b. Ordering that MAPS engage third-party security auditors and internal personnel to run automated security monitoring;

    c. Ordering that MAPS audit, test, and train its security personnel regarding any new or modified procedures;

    d. Ordering that MAPS segment data by, among other things, creating firewalls and access controls so that if one area of MAPS's systems is compromised, hackers cannot gain access to other portions of MAPS's systems;

    e. Ordering that MAPS purge, delete, and destroy, in a reasonably secure manner,

94

customer data not necessary for their provisions of services;

f. Ordering that MAPS conduct regular database scanning and security checks; and

g. Ordering that MAPS routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against Defendant as follows:

a. For an order certifying this action as a Class Action, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

b. For a judgment in favor of Plaintiffs and the Class, awarding them appropriate monetary relief, including actual damages, punitive damages, nominal damages, attorneys' fees, expenses, costs, and such other and further relief as is just and proper;

c. For an order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. For an order requiring Defendant to pay the costs involved in notifying the Class about the judgment and administering the claims process;

e. For a judgment in favor of Plaintiffs and the Class, awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

f. For an award of such other and further relief as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on any and all issues raised in this Amended Class Action Complaint so triable as of right.

Dated: October 3, 2025

Respectfully submitted,

*/s/ Maureen M. Brady*
Maureen M. Brady MO #57800
**MCSHANE & BRADY, LLC**
4006 Central Street
Kansas City, Missouri 64111
Telephone: (816) 888-8010
Facsimile: (816) 332-6295
Email: mbrady@mcshanebradylaw.com

Jeff Ostrow (*pro hac vice*)
**KOPELOWITZ OSTROW, P.A.**
1 West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 332-4200
E-mail: ostrow@kolawyers.com

William B. Federman (*pro hac vice* forthcoming)
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Avenue
Oklahoma City, Oklahoma 73120
Telephone: (405) 235-1560
Email: wbf@federmanlaw.com

Gary Klinger (*pro hac vice* forthcoming)
John J. Nelson (*pro hac vice* forthcoming)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
402 w. Broadway, Suite 1760
San Diego, California 92101
Telephone: (858) 209-6941
Email: gklinger@milberg.com
Email: jnelson@milberg.com

Raina Borrelli (*pro hac vice* forthcoming)
**STRAUSS BORRELLI PLLC**
908 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109

Email: raina@straussborrelli.com

J. Gerard Stanch, IV (*pro hac vice* forthcoming)
Grayson Wells (*pro hac vice* forthcoming)
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801
Email: gstranch@stranchlaw.com
Email: gwells@stranchlaw.com

Andrew J. Shamis (*pro hac vice* forthcoming)
Leanna Loginov (*pro hac vice* forthcoming)
**SHAMIS & GENTILE P.A.**
14 NE 1st Ave., Suite 705
Miami, Florida 33132
Telephone: (305) 479-2299
Email: ashamis@shamisgentile.com
Email: lloginov@shamisgentile.com

Tyler Bean (*pro hac vice* forthcoming)
Neil Williams (*pro hac vice* forthcoming)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: tbean@sirillp.com
E: nwilliams@sirillp.com

*Attorneys for Plaintiffs and the Proposed Classes*